# IN THE SUPREME COURT OF IOWA

No. 10–0483

Filed October 28, 2011

**LEANNE LOEHR** and
**ED LOEHR,**

     Appellees,

vs.

**CRAIG W. METTILLE, BROMO, INC.,** d/b/a **FIRST GENERAL SERVICES OF EAST CENTRAL IOWA,** and **MOBRO, INC.,** d/b/a **380 SERVICE MASTER** and **SERVICEMASTER 380,**

     Appellants.

_____

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Linn County, Thomas L. Koehler, Judge.

Defendants appeal the district court's grant of a new trial on plaintiffs' claims of defamation and wrongful debt collection. **COURT OF APPEALS DECISION AFFIRMED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**

Joe H. Harris, Cedar Rapids, for appellants.

Peter C. Riley of Tom Riley Law Firm, P.L.C., Cedar Rapids, for appellees.

**MANSFIELD, Justice**.

This dispute between a homeowner and a contractor presents the not uncommon scenario where a trial exhibit offered by a party turns out to be something other than the party claimed it to be. Here, the opposing party recognized the flaws in the exhibit before the case was submitted to the jury, but instead of alerting the court, decided to argue those flaws to the jury during the rebuttal stage of closing argument. After the jury returned verdicts, the opposing party moved for a new trial on some claims, alleging misconduct with respect to the exhibit. The district court granted the motion, and this appeal followed.

On our review, we conclude the district court did not lack authority to grant a new trial simply because the objection to the exhibit could have been raised earlier and was not. However, considering all the circumstances, including the absence of real misconduct or prejudice and the opposing party's decision to wait until rebuttal argument to bring forward its concerns, we find the district court abused its discretion in granting a new trial.

### I. Background Facts and Proceedings.

Plaintiffs Leanne and Ed Loehr have a large family with ten children, including several foster children. On May 31, 2007, a second-floor toilet in their home flooded, causing water to pour down through their house. The Loehrs contacted their insurance agent, who put them in touch with Joe Elert, an independent insurance adjuster working on behalf of the Loehrs' insurance carrier EMC. Elert came to the house immediately and referred the Loehrs to two companies run by defendant Craig Mettille. The initial drying and cleanup was performed by defendant ServiceMaster, and defendant First General did the home repairs. The Loehrs signed a work authorization form with ServiceMaster

on June 1, 2007, and a separate work authorization with First General on June 3, 2007.

Within a few days, ServiceMaster was able to get all the water out of the house. At trial, Ms. Loehr testified ServiceMaster did "a good job" and she had no issue with its services. Once ServiceMaster had finished its cleanup, it became First General's responsibility to remove and replace the damaged flooring, carpet, drywall, trim, and other fixtures, as well as to repaint the house.

At the time of the flood, the Loehrs were scheduled to have their home inspected by the Department of Human Services in connection with their foster care license and were anxious to have the repairs completed. Due to the reconstruction process, the Loehrs needed to move out of the house at times. Although EMC reimbursed the Loehrs' hotel and meal expenses and was willing to pay for alternative housing for the entire duration of the repair work, the Loehrs stayed in their home most of the time. The Loehrs were nonetheless concerned about hazards in the home, such as exposed tacks and uncovered electrical outlets, and expressed those concerns to First General.

The reconstruction work was expected to take six weeks, and the Loehrs pushed hard to have First General meet that estimate. The specific scope of work to be performed was negotiated between Elert and First General and itemized in detail. The final supplemented estimate agreed to by the insurance company was $22,741.44.

Some of the initial work performed by First General did not meet quality standards, and First General had to correct it. In other instances, First General redid its work without necessarily agreeing it was unsatisfactory. First General also performed some tasks that were outside the agreed-upon scope of work. All of this led to project delays,

which frustrated the Loehrs. After several weeks, the tensions between the Loehrs and First General were mounting.

Payment for the work was also delayed. Initially, this delay was caused by the need for the first EMC insurance check to be endorsed by two different mortgage holders named as loss payees. Solon State Bank had originated the first mortgage but sold it to PHH Mortgage, a large New Jersey lender. Solon Bank also held a second mortgage on the home. The PHH sign-off took longer than usual which frustrated all parties, but especially Mettille who was waiting to be paid.

A ServiceMaster invoice for $6,503.89 was sent on June 19, 2007.[1] The first EMC insurance check in the amount of $21,938.89 to cover both cleanup and repair work was received by the Loehrs on June 20, 2007, but had to be endorsed by both mortgage companies as loss payees. This process ended up taking approximately a month.

When Ms. Loehr expressed her dissatisfaction with the quality and pace of First General's work, Mettille considered pulling out of the job. According to his testimony, his conditions for staying on the job were that a $15,000 progress payment would be made to First General and that the Loehrs would sign off on each stage of the project as it was completed. He also agreed to assign a new project manager to the Loehrs at their request.

At trial, Mettille claimed that he communicated these terms on June 29, 2007, to Elert, who then relayed them to the Loehrs, got their approval, and then reported that approval back to Mettille the same day. Mettille claimed this sequence of events was supported by an exhibit showing three cell phone calls he had with Elert around that timeframe—

---

[1]This invoice was later reduced to $5,856.21.

an exhibit that became the basis for the Loehrs' new trial motion and that we will discuss in more detail below.

The Loehrs denied ever receiving or approving Mettille's terms. Elert, though, confirmed that Mettille had insisted on a progress payment and sign-offs by the Loehrs as each step was completed in order to remain on the job. Elert recalled this conversation with Mettille occurred some time on or after July 3. However, Elert did not remember calling Ms. Loehr and relaying Mettille's terms to her.

Regardless, it is undisputed that from early July forward the Loehrs were asked to and did sign off on each stage of the project as it was completed.[2] Also, on July 20, as soon as both mortgage companies approved release of funds, the Loehrs arranged for First General to be paid exactly $15,000 out of the $21,938.89 EMC check. The Loehrs directed most of the balance of that check, approximately $7000, to go to themselves. For his part, Mettille did not withdraw from the job and had the project manager replaced.

The Loehrs never directly paid ServiceMaster. Ms. Loehr testified at trial that she did not understand the difference between the two companies, and she believed part of the $15,000 was covering the ServiceMaster invoice.

Throughout July and August 2007, work and rework continued with Ms. Loehr signing off on each phase of the project as it was completed. However, on August 31, Ms. Loehr refused to sign a completion approval for the entire project and instead sent a lengthy list of items to Elert which she said had not been delivered. First General considered most of the items listed by Loehr either to have been

[2]Mettille testified his company had never demanded interim sign-offs from any customer before.

satisfactorily completed or else to be outside the scope of the work it had agreed to. It then credited the Loehrs' account for the remaining items and issued a final invoice in the amount of $6,380.24 on September 6, 2007. The Loehrs were still not satisfied, so they refused to allow Solon Bank to release funds from a second EMC insurance check in the amount of $6,912.34.[3]

The Loehrs asked Stephanie Mai, their mortgage loan officer at Solon Bank, to visit their home to inspect the work that had been done. She did so, and on October 2, 2007, sent a letter to First General itemizing a long list of problems she had seen during her inspection. Her letter concluded, "Solon State Bank will not endorse any further insurance checks to cover the construction job until we have verified that the complaints listed above have been remedied." Mai's observations were made without knowledge of what was actually covered by the scope of work agreed to by First General. Mai also was unaware that Ms. Loehr had signed off on specific phases of the work as it was performed. Mai did not know whether the problems she saw were outside the scope of the project or represented subsequent damage from postclaim water leaks.

Upon receiving Mai's letter, Mettille called her to plead his case. Mettille urged that Ms. Loehr had approved the specific work items as they were completed and that the other items listed in Mai's letter were outside the agreed project scope. Mettille was upset and later admitted

---

[3]The $6,912.34 check was in addition to the earlier $21,938.89 check. The Loehrs, as noted, retained approximately $7000 from the $21,938.89 check and the $6,912.34 check was subsequently deposited in the Loehrs' attorney's trust account. Thus, at the time of trial, the Loehrs or their attorney was holding approximately $14,000 of funds from EMC that had not been paid to either First General or ServiceMaster. The jury ultimately found that the Loehrs did not owe First General anything but owed ServiceMaster $5,856.21.

that during the conversation he called the Loehrs "liars." According to Mai, Mettille characterized the Loehrs as both "liars" and "dummies," but did so only once. Mettille then faxed Mai the documentation supporting his claims and followed up with additional calls. Mai recalled that Mettille phoned her no more than four to six times in total. Mai testified that when Mettille became "a little bit more aggressive" in his calls, she asked the Loehrs' attorney to send Mettille a letter requesting he stop calling her about receiving payment on the Loehrs' account. Mettille still called her "a couple of times" after that.

On November 6, 2007, Mettille drove by the Loehr home. At that time, a friend of the Loehrs was visiting. The friend noticed Mettille's car proceed along the street very slowly, turn around, and then proceed back very slowly while Mettille looked toward the house. The friend felt uncomfortable. When Ms. Loehr saw Mettille from her front door, she became very upset. Mettille admitted he drove by the Loehr home very slowly and scanned it, but maintained he was doing so because one of his new employees had told him about a payment dispute his former company had with the Loehrs over a retaining wall it had installed. Mettille said he wanted to view the condition of the wall. The employee's testimony confirmed this claim.

On November 6, 2007, (the same day as the aforementioned incident at the home), the Loehrs filed suit against Mettille and his companies asserting claims for defamation and illegal collection practices[4] and seeking actual and punitive damages. They also sought a declaratory judgment to determine their contractual rights including any amounts that might be owed to ServiceMaster or First General. Their

---

[4]The wrongful debt collection practices claim was based on Iowa Code section 537.7013 (2007), part of the Iowa Consumer Credit Code.

petition alleged that Mettille "ha[d] engaged in a campaign of defamation and harassment against [the] Loehrs" by calling them "liars" and had "contacted other friends and acquaintances of [the] Loehrs and engaged in harassing and defamatory actions" that "constitute illegal collection practices, defamation and other tortious conduct." First General and ServiceMaster answered, denied the Loehrs' allegations of wrongful conduct, and counterclaimed for amounts due.

A four-day trial was held from May 4 through May 7, 2009, with twenty-one witnesses and nearly 70 exhibits. The jury ultimately rejected the plaintiffs' claims of defamation and unfair collection practices. The jury awarded ServiceMaster $5,856.21 for its breach of contract counterclaim, while finding that First General had not proven its separate breach of contract counterclaim.

The plaintiffs filed a motion for new trial on May 21, 2009, arguing that Mettille committed misconduct by giving false testimony and fabricating an exhibit in order to support that testimony. The claimed misconduct related to the defendants' Exhibit RR, which purported to show cell phone calls Mettille had with Elert during the June 27–29, 2007 time period, and to Mettille's related testimony. On the last day of trial, Mettille testified as follows:

> A. . . . I believe I called Joe Elert—I believe he called me, left me a message, and his number would have come up on my cell phone.
>
> And then I returned Joe Elert's call and informed him that we were not going to finish the Loehrs'.
>
> . . . .
>
> Q. Now, you described a conversation that you had with Joe Elert. Do you remember the date of that conversation? A. The first phone call—and I looked at my

cell phone records because I was unclear—was on the 27th of June.

Q. And you—you said you spoke to him several days later. What was that conversation? A. The two days after that I spoke with Mr. Elert on the 29th, it was around noon, and he asked me to reconsider, he would like for me to finish the project.

. . . .

A. . . . And at that point I told Joe Elert, I said, okay, Joe, we'll finish the Loehrs' house, but these are my conditions. My conditions were I need $15,000 up front or as soon as possible. . . .

So I said, what we'll do then, Joe, is we'll have her sign off on the stage of construction before that she's satisfied before we move on to the next stage. I don't want to get to the end and have her not happy with the drywall, have her not be happy with the paint, and have a complete mess on our hands at the end of the project.

Q. What did Mr. Elert say when you said I want to use this sign-off stage by stage? A. He said let me contact the Loehrs and I'll call you back.

Q. And did he call you back? A. He called—He called me back, got his number—I talk a lot on my cell phone, and his number was up on my cell phone, and I called Joe Elert back immediately and he said Leanne Loehr's okay with that and you're good to finish the job.

Q. Mr. Mettille, I'm handing you what's been marked as Defendant's Exhibit RR. Would you examine that?

. . . .

Q. Do you recognize that document? A. Yes. These are my cell phone records.

Q. Do the calls that you just related, do those phone calls appear on this statement? A. Yes, they do.

The Exhibit RR cell phone records were admitted following this testimony without objection. Mettille claimed that Exhibit RR reflected the three calls he had with Elert. The Loehrs' counsel had an

opportunity to cross-examine Mettille regarding the exhibit, but did not challenge its authenticity or Mettille's testimony with respect to it.

However, a close examination of the exhibit later showed it was comprised of pages 37, 13, and 59, in that order, culled from an eighty-one page phone bill. Only one of the three pages actually represented calls to or from Mettille himself. Although all three pages said "Account Name: CRAIG METTILLE" at the top in clear type, in a less visible shaded area one could see a different employee mentioned on each page—"Scott," "Lonnie," and "Craig" respectively—thus indicating that only the *last page* of the exhibit actually represented calls from Mettille's personal cell phone.

The defendants' counsel did not provide this exhibit to the plaintiffs until the day before it was offered, and it was not offered until the last morning of trial. The Loehrs' counsel maintained he did not notice the exhibit was not what Mettille claimed it to be until after the close of evidence, during a lunch break before final arguments. At that point, counsel decided to make an issue of Exhibit RR during closing argument, although he did not do so until his rebuttal. Arguments were not transcribed, but the parties later stipulated as follows:

> THE COURT: Any further record, Mr. Harris?
>
> MR. HARRIS: . . . I would ask Mr. Riley to stipulate for the record that, in fact, during Plaintiffs' rebuttal to the jury, the only issue that he argued to the jury was the alleged falsity of Exhibit RR and that it had been fabricated by the Defendants.
>
> MR. RILEY: I don't believe that was the only issue. I know that the rebuttal argument was brief. But I would stipulate that I did point out and discuss and show the reason why Exhibit RR was not what it purported to be and it was obviously a fabrication, but I don't know that that's the only thing I said.
>
> . . . .

MR. RILEY: I would stipulate as I indicated, that I did discuss in my rebuttal argument the fact that Exhibit RR was not what Mr. Mettille claimed it to be, and I showed to the jury why it was not, based on the specifics in the detail showing it was three different person's phones, that it was an outgoing call, took less than a minute. I discussed all of that in my rebuttal argument.

MR. HARRIS: I'll accept that.

THE COURT: Is that a fair summation? That's as I remember it, anyway.

MR. HARRIS: Accept that, your Honor.

A hearing on plaintiffs' motion for new trial was held on January 6, 2010. At that time, affidavits were received from Mettille and his office manager Jill Tyler, and a professional statement from Mettille's attorney Joe Harris, with each claiming that the misleading exhibit was an innocent mistake and not a deliberate fabrication. Tyler and Mettille also testified in person, with Mettille ultimately admitting that the cell phone records showed only a single call of less than one minute made by him to Elert on June 29, 2007. This conflicted with his trial testimony that there were three calls between himself and Elert during the June 27– June 29 time period.

On February 22, 2010, the district court granted the Loehrs' request for a new trial under Iowa Rule of Civil Procedure 1.1004. The Loehrs did not request, and were not granted, a new trial on the breach of contract counterclaims. As their counsel stated:

I don't believe it's necessary to retry the Defendants' claims against my clients because the jury had full opportunity to consider them, made decisions as to them, and it's not like we were—our claims—We were not able to make our full case because we didn't realize what they had done or this exhibit or that he had contrived the testimony, but I don't think it would adversely affect them, because it's us that were deprived the opportunity to present evidence going to his credibility, so I don't think it's necessary to retry the Defendants' counterclaims.

In granting a new trial, the district court reasoned as follows:

> Contrary to the assertions of Mr. Mettille, the Court is convinced that he did deliberately attempt to mislead the jury, and his testimony with regard to other issues weighs heavily on his credibility. The Court agrees with the Plaintiffs that, rather than a "mistake," Mr. Mettille's "evidence" was clearly contrived and he certainly was not acting in good faith. This misconduct was prejudicial to Plaintiffs. The Plaintiffs should be granted a new trial on their original causes of action.

On March 23, 2010, the defendants filed a timely notice of appeal. We transferred the case to the court of appeals. That court reversed the grant of new trial on the ground that the Loehrs had failed to preserve error by not objecting to Exhibit RR before the case was submitted to the jury. As the court of appeals explained, the Loehrs' counsel "had more than one opportunity to raise the possible problems with the exhibit before the case was submitted to the jury, but did not do so." The court cited Iowa Rule of Civil Procedure 1.920 as one mechanism he might have used.[5] The court also cited *Schmitt v. Jenkins Truck Lines, Inc.* for the proposition that counsel cannot "after an unfavorable verdict, take advantage of an error which he could and should but did not call to the court's attention." 170 N.W.2d 632, 660 (Iowa 1969). We granted further review.

## II.  Standard of Review.

"The scope of our review of a district court's ruling on a motion for new trial depends on the grounds raised in the motion." *Channon v. United Parcel Serv., Inc.*, 629 N.W.2d 835, 859 (Iowa 2001). If the motion is based on a discretionary ground such as misconduct it is reviewed for an abuse of discretion. *See Roling v. Daily*, 596 N.W.2d 72, 76 (Iowa

---

[5]This rule provides, "At any time before final submission, the court may allow any party to offer further testimony to correct an evident oversight or mistake, imposing such terms as it deems just."

1999). "An abuse of discretion consists of a ruling which rests upon clearly untenable or unreasonable grounds." *Lawson v. Kurtzhals*, 792 N.W.2d 251, 258 (Iowa 2010). An "unreasonable" decision is one that is not based on substantial evidence. *Channon*, 629 N.W.2d at 859. "In ruling upon motions for new trial, the district court has a broad but not unlimited discretion in determining whether the verdict effectuates substantial justice between the parties." Iowa R. App. P. 6.904(3)(*c*). Also, we are "slower to interfere with the grant of a new trial than with its denial." *Id.* r. 6.904(3)(*d*). However, unless a different result would have been probable in the absence of misconduct, a new trial is not warranted. *Mays v. C. Mac Chambers Co.*, 490 N.W.2d 800, 803 (Iowa 1992).

### III. Preservation of Error.

The court of appeals reversed the district court's grant of a new trial because the Loehrs had failed to preserve error, citing *Schmitt* as authority and focusing on the following passage:

> [I]t is axiomatic that counsel for a party cannot sit idly by and not attempt to direct the attention of the trial court to a possible limitation or restriction on the use of evidence and then, after an unfavorable verdict, take advantage of an error which he could and should but did not call to the court's attention.

170 N.W.2d at 660 (internal quotation marks omitted).

The court of appeals interpreted this statement as an absolute prohibition on the granting of a retrial based on the admission of improper evidence when the moving party was aware of the problem and failed to object to the evidence before the case was submitted to the jury. Applying this standard to the Loehrs' misconduct claim against Mettille, that court found that because the Loehrs had discovered the error before jury submission, they were forbidden from raising the matter after

receiving an unfavorable verdict. *See* Iowa R. Civ. P. 1.920 (allowing further testimony to be offered at any time before final submission to correct an evident oversight or mistake).

Our decision in *Schmitt* should not be read so absolutely. *Schmitt* does not prohibit a judge from granting a new trial in every case where the ground for new trial was not raised at the first available opportunity during trial. Although a party loses its *right* to a new trial if it neglects timely error preservation, this does not necessarily bar a district court from exercising its *discretion* to grant a new trial if a ground set forth in rule 1.1004 has been met. In *Schmitt* we also recognized:

> [N]otwithstanding counsel's failure to make a record which would authorize this court to reverse the judgment on appeal, the trial court in its consideration of a motion for new trial is not limited by the status of the record in this respect when it feels the verdict fails to administer substantial justice . . . . [T]he trial court has the inherent right to grant another trial where substantial justice has not been effectuated.

*Schmitt*, 170 N.W.2d at 660.

The trial court is not bound by the record in the same way that the appellate courts are. *Id.* Therefore, it is not invariably an abuse of discretion for a trial judge to grant a motion for new trial based on a matter that could have been raised earlier, but was not. In *Schmitt*, we declared that "inaction on counsel's part weighs heavily in evaluating the right to a new trial." *Id.* (internal quotation marks omitted). Although it weighs heavily, it is not dispositive. It is a weighty factor to be considered, but it potentially can be outweighed by other considerations.

If we were considering an appeal from a denial of the Loehrs' motion for new trial, then error would not have been preserved. However, the issue here is the jurisdiction of a trial judge to exercise his or her discretion under rule 1.1004 despite the lack of a prior objection.

We hold that under *Schmitt* the district court could consider the Loehrs' new trial request.

Historically, this has been the rule in Iowa. In *Farr v. Fuller*, 8 Iowa 347 (Iowa 1859), we declined to reverse a trial court's decision to order a new trial because of an error in jury instructions, notwithstanding the plaintiff's failure to make a timely objection to those instructions. We said:

> It was perfectly competent for the district court, upon its attention being called to the motion, to order a new trial, when satisfied that an error had been committed to the prejudice of the plaintiff, whether exceptions were taken to the action of the court at the time, or not.

*Farr*, 8 Iowa at 348.

Iowa Rule of Civil Procedure 1.924 now makes clear that, with respect to jury instructions, untimely objections may not be considered. *See Olson v. Sumpter*, 728 N.W.2d 844, 849–50 (Iowa 2007) (finding district court could not order new trial based on asserted instructional error that was not timely raised before closing arguments). Specifically, rule 1.924 provides that "all objections" must be made during the instruction conference, and "[n]o other grounds or objections shall be asserted thereafter." The 1943 Official Comment on rule 196 (rule 1.924's predecessor) indicates that this was a "great change in the rule." Yet in other contexts, we think *Farr* remains good law, as *Schmitt* illustrates.

In fact, we have said repeatedly that district courts have inherent authority to grant new trials. *See, e.g., Estate of Hagedorn ex rel. Hagedorn v. Peterson*, 690 N.W.2d 84, 87 (Iowa 2004); *Wilson v. IBP, Inc.*, 558 N.W.2d 132, 144 (Iowa 1996). In *Lehigh Clay Products, Ltd. v. Iowa Department of Transportation*, we noted that "Iowa has long recognized

the trial court's inherent power to grant a new trial where the verdict fails to administer substantial justice" and that "[t]he trial court is not limited to the grounds for granting a new trial specified in Iowa Rule of Civil Procedure 244 [now rule 1.1004]." 512 N.W.2d 541, 543–44 (Iowa 1994) (citations omitted). In *Lehigh Clay Products*, the district court cited four reasons why it believed the verdict had not achieved substantial justice. *Id.* at 543. Although we ultimately reversed the grant of new trial as an abuse of discretion, we did not suggest that the district court lacked the authority to grant a new trial unless the grounds had been raised during trial. For example, one ground cited by the district court was that "the DOT's numerous objections likely prejudiced the jury [against the DOT]" and another was that "the propensity of the DOT's expert witness to anxiety attacks and his lack of testimonial experience diminished his persuasiveness." *Id.* Presumably, DOT did not object at trial to its own objections or to the lack of testimonial experience of its own expert. Yet we rejected these grounds for new trial on their merits (or lack thereof), not because DOT failed to raise them during trial. *Id.* at 546.

It needs to be emphasized, of course, that failure to make a contemporaneous objection will preclude a party from raising the matter on appeal if the motion for new trial is *denied*. *See, e.g., Rudolph v. Iowa Methodist Med. Ctr.*, 293 N.W.2d 550, 555 (Iowa 1980) (noting "the general rule that parties are not permitted to delay objections until it is too late for the problem to be corrected").

### IV. Substantive Merits.

We now turn to the substantive merits of the trial court's decision to grant a new trial, to determine whether it abused its discretion.

**A. Rule 1.1004(2).** Iowa Rule of Civil Procedure 1.1004(2) authorizes the district court to grant a new trial when there has been

"[m]isconduct of the . . . prevailing party" that "materially affected movant's substantial rights." Thus, while the trial court has broad discretion, there must have been misconduct, and it must have been prejudicial. *See Berg v. Des Moines Gen. Hosp. Co.*, 456 N.W.2d 173, 178 (Iowa 1990); *McConnell v. Aluminum Co. of Am.*, 367 N.W.2d 245, 248 (Iowa 1985). If the district court granted a new trial on "clearly untenable" grounds, we should reverse. *Lehigh Clay Prods.*, 512 N.W.2d at 544 (internal quotation marks omitted).

**B. Misconduct.** The district judge found that Mettille "did deliberately attempt to mislead the jury, and his testimony with regard to other issues weighs heavily on his credibility." We conclude this finding of a deliberate attempt to mislead is not supported by the record. The record indicates that Exhibit RR was the product of careless reading and wishful thinking rather than intentional fraud.

Jill Tyler, the office manager for ServiceMaster and First General, testified at the posttrial hearing that she was asked by Mettille to obtain the records from the companies' cell phone provider for all calls Mettille had made on his personal cell phone to Elert's phone number during June and July 2007. Tyler received a detailed statement with multiple sheets from the cell phone provider. From those records, Tyler retrieved three pages of calls to Elert. She provided those three pages to Mettille and they became Exhibit RR.

Tyler explained that after closing arguments, Mettille called her and was "quite angry." He questioned whether she had given him what he had asked for. Tyler said this was the first time she noticed the shaded areas on each page where it identified the specific employee of Mettille's companies whose cell phone usage was reflected on that page of the bill.

Tyler's oversight was not hers alone. Mettille's counsel likewise submitted a professional statement that he had previously believed Exhibit RR contained only cell phone calls between Mettille and Elert. He did not realize otherwise until the Loehrs' counsel made his rebuttal argument.

Mettille also testified at the posttrial hearing that he previously believed the three pages of Exhibit RR were records of only his personal calls. Mettille, like his counsel and Tyler, said he did not realize otherwise until he heard the rebuttal argument of the Loehrs' counsel. Mettille confirmed Tyler's testimony regarding his original instructions to her, as well as the heated conversation between them that occurred after closing arguments. The Loehrs' counsel cross-examined Mettille at some length at the posttrial hearing, but did not try to challenge Mettille's contention that there had been an innocent misunderstanding regarding the exhibit. And the Loehrs' counsel himself conceded he did not notice the problem with Exhibit RR until the lunch break before closing arguments.

In short, we do not share the district court's view that Mettille "contrived" Exhibit RR to mislead the jury. This would require disbelief not only of Mettille's but also Tyler's testimony. The error that occurred was understandable. Mettille's name appeared prominently at the top of the each page of the cell phone records. It is significant that no one else noticed the different names in the shaded areas of the three pages until the Loehrs' counsel made this discovery during the recess before the case was submitted to the jury. Furthermore, if one were going to fabricate an exhibit purporting to show Mettille's personal calls, it seems implausible that the names of the other callers would be left on the exhibit, albeit in shaded areas.

**C. Prejudice.** Even if there had been misconduct, we cannot agree it prejudiced the Loehrs. Although Mettille's testimony linking Exhibit RR to specific alleged conversations with Elert was clearly incorrect, the circumstantial evidence indicates that the Loehrs and Mettille did make some kind of a deal. Elert confirmed that Mettille threatened to pull off the job and demanded a progress payment and sign-offs as a condition of staying. Elert did not recall whether the Loehrs assented to this proposal, and the Loehrs denied assenting to it, but the facts are that Ms. Loehr did make a $15,000 payment; she did thereafter sign off on phases of the project as they were completed; and the project manager was replaced. What bolstered Mettille's side of the story was not the phone records, since no one disputed that Elert and Mettille had conversations, but instead how the parties behaved.

Potentially, the cell phone records, even if they had been what Mettille asserted them to be, could have detracted from Mettille's credibility. Based on Elert's logs, Mettille had threatened to leave the job in early July, not in late June. In his deposition testimony, before Mettille became aware of the contents of the cell phone records, Mettille had testified that he could only "guess" he spoke with Elert some time before July 9. When Mettille later used Exhibit RR to fill in this gap in his recollection, he created a conflict between his testimony and Elert's records. And, in any event, what mattered most for breach of contract purposes was not whether the parties reached some kind of modus vivendi in late June or early July, but whether Mettille's companies had performed suitable work that the Loehrs failed to pay for as promised.

Even more importantly, though, the Loehrs did not move for a new trial on the breach of contract counterclaims. They only sought a new trial on their defamation and wrongful debt collection claims, where the

jury had found for Mettille. Exhibit RR had no direct bearing on those claims and was potentially relevant only to the extent (noted by the district court) that it might affect Mettille's overall credibility.

Yet even if one discounted Mettille's testimony entirely and accepted in full the testimony offered by the Loehrs and their other witnesses, the evidence in support of their two claims was fairly thin. The defamation evidence consisted of Mai's (the loan officer's) testimony that Mettille had once told her the Loehrs were "dummies and liars" in response to the Loehrs' complaints to Mai about First General's work and in an effort to get Mai to release the funds. The wrongful debt collection practices claim arose primarily from the single incident where Mettille drove slowly down the street in front of the Loehrs' home.[6] We have difficulty seeing how Exhibit RR could have affected the jury's verdicts on these claims.

But most significant of all is the fact that the Loehrs' counsel made an apparently tactical decision to use Exhibit RR as the centerpiece of his rebuttal closing argument. Although (as the court of appeals noted) counsel could have asked the court to reopen evidence under Rule 1.920, he instead waited until rebuttal argument to expose the problems with the exhibit, thereby assuring the flaws in the exhibit would be the last thing called to the jury's attention and the other side would have no opportunity to respond. This is a strong indication that the Loehrs' counsel did not believe the defective exhibit would be prejudicial, but instead beneficial, to his clients' case. As we held in *Schmitt*, although previous "inaction on counsel's part" does not deprive the district court of jurisdiction to grant a motion for new trial, it "weighs heavily in

---

[6]Mettille moved for a directed verdict at the close of evidence on the ground that section 537.7103 did not apply because the transactions with the Loehrs were not "consumer credit transactions" as defined in Iowa Code sections 537.1301(12)–(13). We do not reach this issue.

evaluating the right to a new trial." 170 N.W.2d at 660 (internal quotation marks omitted).

The Loehrs' approach, from all we can tell, was effective. First General recovered nothing on its claim for nonpayment; ServiceMaster was awarded $5,856.21, but neither this amount nor the quality of its work was disputed. As a result of the jury verdict, the Loehrs apparently were able to retain approximately $8000 in insurance proceeds that were intended to have gone to First General. Notably, the Loehrs did not seek a new trial on the breach of contract counterclaims, expressing satisfaction with this part of the trial outcome, instead seeking a new trial only on the defamation and debt collection practices claims as to which Exhibit RR was seemingly of little relevance.

For the foregoing reasons, even taking into account the district court's broad discretion, we cannot affirm its decision to order a second trial on the Loehrs' defamation and wrongful debt collection claims against Mettille. Neither misconduct nor prejudice was shown, and if anything, it appears that the Loehrs' counsel was able to exploit the defects in Mettille's exhibit successfully. Therefore, the rule 1.1004(2) ground for new trial was "clearly untenable." *See Lehigh Clay Prods.*, 512 N.W.2d at 544 (internal quotation marks omitted). The verdicts here effectuated substantial justice. Iowa R. App. P. 6.904(3)(*c*).

## V. Conclusion.

Although our reasoning differs somewhat from that of the court of appeals, we conclude the district court abused its discretion in ordering a new trial. Therefore, we affirm the court of appeals and reverse the district court's order granting a new trial, directing it instead on remand to enter judgment on the jury verdicts.

**COURT OF APPEALS DECISION AFFIRMED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**