# In the Iowa Supreme Court

No. 24–1669

Submitted January 21, 2026—Filed April 3, 2026

**Matthew McQuillen** and **Elizabeth McQuillen**, individually and as limited co-guardians and co-conservators of **Margaret G. McQuillen,**

Appellees,

vs.

**West Side Transport, Inc.,** and **Clifford Charles Takes,**

Appellants.

Appeal from the Iowa District Court for Linn County, Justin Lightfoot, judge.

A semitrailer driver and his employer appeal from a jury verdict in favor of an injured motorist. The motorist moves to dismiss the appeal on the basis of an alleged settlement agreement. **Motion to Dismiss Appeal Denied; District Court Judgment Affirmed.**

May, J., delivered the opinion of the court, in which all justices joined.

Mark E. Weinhardt (argued), Danielle M. Shelton, and Jason R. Smith of Weinhardt & Lantz, P.C., Des Moines, and Kevin M. Reynolds and Richard J. Kirschman of Whitfield & Eddy, PLC, Des Moines, for appellants.

Matthew G. Novak (argued) and Bradley J. Kaspar of Pickens, Barnes & Abernathy, Cedar Rapids, and Joel T. Andreesen of Rodriguez & Associates, Bakersfield, California, for appellees.

**May, Justice.**

Margaret McQuillen suffered great harm when her passenger vehicle collided with a semitrailer pulled by a truck tractor. Margaret's family (the McQuillens) brought this suit against the truck driver and his employer, a trucking company (the defendants). Following trial, the jury found that (1) the defendants had been negligent but so had Margaret, (2) fault should be assigned 73% to the defendants and 27% to Margaret, and (3) Margaret's damages were $35,793,475. Based on these findings, the district court entered judgment in the McQuillens' favor for $26,129,236.80.

In this appeal, the defendants argue that errors in the closing arguments require a new trial. The McQuillens disagree. The McQuillens have also moved to dismiss this appeal based on an alleged settlement agreement.

We deny the McQuillens' motion and reach the merits. But we find no abuse of discretion in the district court's handling of closing arguments. So we affirm.

**I. Background.**

**A. The Accident.** It became quite foggy near Anamosa on the afternoon of March 19, 2020. Margaret McQuillen was driving southbound on Highway 151. There was evidence that Margaret may not have had her headlights on. There was also evidence, which we will discuss more below, that Margaret may have been using her phone.

Meanwhile, Clifford Takes was driving an eighteen-wheel semitrailer northbound on Highway 151. Takes made an unprotected left turn, crossing in front of the southbound lane, to turn off Highway 151 and onto a side street, where he planned to park. "Unprotected" means there was no stoplight or other

traffic device that would stop the oncoming southbound traffic. This means that the southbound traffic—including Margaret—had the right-of-way.

Margaret's southbound car collided with the side of the semitrailer. This was an "underriding" collision, which means that Margaret's car slid underneath the semitrailer. The car's "greenhouse"—the roof, pillars, windshield, and side windows—was basically sheared off.

The state patrol investigated the accident. This led to a citation against Takes for failing to yield upon a left-hand turn. Takes pleaded guilty to the citation.

**B. Margaret's Injuries.** The collision caused extraordinary harm to Margaret. Her breathing and pulse had stopped before the ambulance arrived. She was finally resuscitated at the hospital, but only after prolonged CPR. A physician said she had been medically dead. Her injuries included severe traumatic brain injuries, lacerations, and fractures, including about one hundred fractures to her skull. She underwent lengthy brain injury rehabilitation. There is evidence that she will experience permanent neurological deficiencies.

**C. This Lawsuit.** In 2022, Margaret's parents brought this lawsuit against Takes as well as West Side Transport, Inc., which employed Takes.[1] The McQuillens alleged that Takes was negligent in several ways and that his negligence caused the accident. They also alleged that West Side was vicariously liable for Takes's negligence. And they asserted direct claims against West Side based on its own alleged negligence.

---

[1]The petition also brought a products liability claim against Wabash National Corporation, the designer and manufacturer of the semitrailer. Those claims were dismissed before trial and are not relevant to our analysis.

West Side and Takes answered the petition. They both denied the McQuillens' claims. They also alleged that Margaret's negligence contributed to the accident.

**D. Trial.** Trial commenced on May 28, 2024. The jury heard seven days of evidence. On June 7, the court read the instructions to the jury, the parties made their closing arguments, and the case was submitted. As will be discussed more below, there were some objections during closing arguments. There were also some requests for mistrial, which the court denied.

Concerning the jury instructions: after much discussion with counsel, the court ultimately concluded that only some of the McQuillens' claims should be submitted to the jury. For starters, the court declined to submit any of the claims of direct negligence by West Side. This left only claims of negligence by Takes, for which West Side would also be vicariously liable. As for these claims, the court submitted three specifications of negligence, namely:

a. Failing to yield the right-of-way upon a left turn; or

b. Failure to maintain a proper lookout; or

c. Failure to discontinue operation of a vehicle under hazardous conditions.

As for Margaret's alleged contributory fault, the court submitted two specifications of negligence:

a. Driving her vehicle without having the vehicle's headlights illuminated when fog conditions reduced visibility to 500 feet or less; or

b. Failing to maintain a proper lookout . . . .

**E. The Verdict.** The jury found the defendants 73% at fault and Margaret 27% at fault. The jury found Margaret suffered damages of $35,793,475,

including several kinds of future damages, such as future medical expenses exceeding $10 million.

Based on this verdict, the district court entered judgment in the McQuillens' favor for $26,129,236.80. The defendants then unsuccessfully moved for a new trial or for judgment notwithstanding the verdict. This appeal follows.

## II. Arguments on Appeal.

The defendants argue that we should reverse and remand for new trial for three reasons. First, the defendants contend that the McQuillens engaged in improper closing argument by suggesting that the jury should treat a particular rebuttal witness as an expert. Second, the defendants complain that the McQuillens engaged in improper closing argument by suggesting that the jury could find the defendants negligent on grounds other than those described in the specifications. Finally, the defendants claim that the district court wrongly prevented them from arguing that future damages must be reduced to present value.

The McQuillens disagree with all of these arguments. In addition, the McQuillens claim that because the parties have settled, the appeal is moot.

## III. Mootness Issue.

We start by considering the McQuillens' mootness claim. An appeal can become moot if any opinion we might issue would lack any "force or effect in the underlying controversy." *State v. Hightower*, 8 N.W.3d 527, 544 (Iowa 2024) (quoting *Belin v. Reynolds*, 989 N.W.2d 166, 171 (Iowa 2023)). For instance, if the parties have settled the dispute on which an appeal is based, that settlement can leave the appeal moot. *See, e.g.*, *State ex rel. Dobbs v. Burche*, 729 N.W.2d 431, 435 (Iowa 2007). In those cases, we usually won't decide the appeal

(although there are exceptions). *Cf. Hightower,* 8 N.W.3d at 544–45 (discussing the public-importance exception).

This is not one of those cases. The McQuillens provide several letters that purportedly show a settlement that renders this appeal moot. We read the letters differently. The letters only show an agreement as to how the defendants' insurers can make payments on the McQuillens' judgment. But the letters do not show that the parties agreed to a complete settlement of this dispute or even an agreement to dispose of this appeal. So we deny the McQuillens' motion.

**IV. Merits.**

We now turn to the arguments raised in the defendants' brief. As mentioned, all of them concern the closing arguments. So we start with a brief discussion of the law governing closing arguments. Then we address the defendants' specific complaints.

**A. Closing Arguments in General.** A closing argument is a speech in which an attorney tries "to convince" the jury that the lawyer's "view of the disputed issues is correct and that it should render a verdict accordingly." H. Mitchell Caldwell, L. Timothy Perrin & Christopher L. Frost, *The Art and Architecture of Closing Argument,* 76 Tul. L. Rev. 961, 969 (2002). Yet, in our law-based system of justice, the jury is necessarily limited as to what grounds it may base its verdict on. Therefore, closing arguments must also be limited so that jurors aren't led toward basing their verdict on improper grounds. *See Kinseth v. Weil-McLain,* 913 N.W.2d 55, 73 (Iowa 2018).

In this case, the jury was properly instructed about its verdict-finding duties and how to execute them lawfully. The jury was properly instructed to reach its verdict "based solely on" the law reflected in the court's instructions, the evidence presented at trial, and the jurors' reason and common sense. And

the jury was also properly instructed to "not be influenced by any personal sympathy, bias, prejudices or emotions."

"A proper closing argument will aid a jury in fulfilling these duties." *Tarbox ex rel. S.K. v. Obstetric & Gynecologic Assocs. of Iowa City & Coralville, P.C.*, 13 N.W.3d 546, 565 (Iowa 2024) (Christensen, C.J., concurring). Thus, a proper argument is limited to the instructed law, "the evidence adduced from the witnesses, the exhibits admitted into evidence, and the inferences reasonably deductible from the testimony and exhibits." *Whittenburg v. Werner Enters. Inc.*, 561 F.3d 1122, 1129 (10th Cir. 2009) (quoting Jacob Stein, *Closing Arguments* § 1:14 (2d ed. 2005)). To be sure, attorneys "are permitted some latitude," *Olson v. BNSF Ry.*, 999 N.W.2d 289, 300 (Iowa 2023), and they "may draw conclusions and argue permissible inferences which reasonably flow from the evidence presented," *State v. Carey*, 709 N.W.2d 547, 554 (Iowa 2006) (quoting *State v. Thornton*, 498 N.W.2d 670, 676 (Iowa 1993)). Even so, proper argument must remain grounded in that evidence and the instructed law.

Conversely, improper argument "may encourage the jury to stray from its task" and base its verdict on improper factors. *Tarbox ex rel. S.K.*, 13 N.W.3d at 565. So, for instance, it is improper to make a "melodramatic argument" that "does not help the jury decide their case but instead taints their perception to one focused on emotion rather than law and fact." *Rosenberger Enters., Inc. v. Ins. Serv. Corp. of Iowa*, 541 N.W.2d 904, 908 (Iowa Ct. App. 1995); *see Belhak v. Smith*, 21 N.W.3d 535, 542 (Iowa 2025) ("Misconduct may arise when a lawyer during closing argument employs 'overinflammatory means that go outside the record or threaten to improperly incite the passions of the jury.' " (quoting *Carey*, 709 N.W.2d at 556)); *State v. Drake*, 105 N.W. 54, 55 (Iowa 1905) (insisting that counsel must "abstain from inflammatory appeals to passion and prejudice").

One example is "golden rule" arguments, which improperly ask "jurors to put themselves in the place of a party or victim," *Tibodeau v. CDI, LLC*, No. 16–0560, 2017 WL 2665107, at *4 (Iowa Ct. App. June 21, 2017) (quoting *State v. Ayabarreno*, No. 13–0582, 2014 WL 465761, at *4 (Iowa Ct. App. Feb. 5, 2014)), thus suggesting that jurors should "depart from neutrality and . . . decide the case on the basis of personal interest and bias rather than on the evidence," *Belhak*, 21 N.W.3d at 543 (quoting *Ivy v. Sec. Barge Lines, Inc.*, 585 F.2d 732, 741 (5th Cir. 1978)).

With all of this said, the propriety or impropriety of a particular argument often depends on the particular circumstances of the trial, not all of which are revealed by the transcripts that appellate courts review. Rather, the district judge—who actually sat through the trial—is often best positioned to make those determinations. *See id.* And so we afford the district court "broad discretion in passing on propriety of" closing arguments. *Moore v. Vanderloo*, 386 N.W.2d 108, 116 (Iowa 1986).

Moreover, even when a zealous advocate steps over the sometimes-blurry line between proper and improper argument, that alone does not require a second trial. Rather, a retrial is only necessary if the improper argument was sufficiently prejudicial that "a different result would have been probable in the absence of misconduct." *Kinseth*, 913 N.W.2d at 68 (quoting *Loehr v. Mettille*, 806 N.W.2d 270, 277 (Iowa 2011)). And here again, we recognize that the district judge—who saw and heard the evidence and arguments firsthand—is generally "in the best position" to make this determination. *Belhak*, 21 N.W.3d at 543. As we said in *Olson v. BNSF Railway*,

> As firsthand observers of the alleged misconduct—and any jury reaction elicited by it—trial courts are entitled to substantial discretion in determining whether the misconduct was prejudicial.

> We have long recognized that trial judges' advantageous point of view requires that their conclusions on such matters be given significant weight by reviewing courts, whose analysis is confined to words written on a page.

999 N.W.2d at 300 (citation omitted).

**B. Calling Lubben an "Expert."** Now we turn to the defendants' specific allegations of misconduct in closing arguments. We start with the defendants' claim that the McQuillens wrongfully referred to "an undisclosed and unqualified lay rebuttal witness as an expert witness." We conclude that the district court did not abuse its discretion by rejecting this claim.

To explain why, we need to provide some additional background facts. As mentioned, the defendants contended—and the instructions allowed the jury to find—that Margaret was negligent for failing to maintain a proper lookout. In particular, the defendants claimed that Margaret was distracted by her cellphone. As support for this theory, the defendants called a digital forensics expert, Joshua Lorencz, who had examined extracted data from Margaret's cellphone. Lorencz testified that "the device screen or a device button" on Margaret's phone had last been "manipulated 13 seconds before the collision." Lorencz also testified about a specific app—Snapchat. According to Lorencz, a person named Grace Lubben had sent a Snapchat message (a "snap") less than a minute before the collision, and Margaret "read it" approximately "42 seconds" before the collision. Lorencz acknowledged, though, that he "personally" was not a user of Snapchat. Lorencz also acknowledged that he had not spoken with Grace Lubben.

On rebuttal, the McQuillens called Grace Lubben, who was permitted to testify without objection. Lubben, who was twenty-one at the time of the trial, testified that she was a childhood friend of Margaret. They had both used

Snapchat—including a feature called Snap Map—since middle school. In March 2020, when the accident happened, Lubben and Margaret were using Snap Map to share their locations with each other. Lubben explained that Snap Map locations only update when the Snapchat application is being used. So, when Margaret was not using Snapchat, Snap Map would only show her location at the last place she used Snapchat.

Lubben testified that after she learned Margaret was in a crash, Lubben tried to use Snap Map to find Margaret's location. Lubben testified that Snap Map showed Margaret's last known location was still at home. This meant, Lubben said, that Margaret "had not been using SnapChat at the time of the accident." On cross-examination, Lubben conceded that she wasn't a digital forensic examiner.

But during closing arguments, the McQuillens' counsel referred to Lubben as a "SnapChat expert." Counsel compared Lubben with Lorencz, saying, "[Lorencz] was a digital forensic expert, but he wasn't a SnapChat expert. How could he be one if he's never used one, never had one, never even heard of Snap Maps?"

At a break, defense counsel moved for mistrial on two grounds.[2] The first of those grounds was a complaint that the McQuillens' counsel should not have referred "to Grace Lubben as an expert" or compared Lubben with Lorencz, "who is an actual expert." Defense counsel noted that the jury would be instructed about experts and "how the jury is to consider experts." And so, counsel worried that "[c]alling Grace Lubben an expert is going to be confusing to the jury and . . . is a clear error and grounds for a motion for mistrial."

---

[2]The second ground is addressed in the next division.

The district court disagreed. The court did not think that the McQuillens' counsel was "necessarily using expert and expert witness" in any distinctively legal way. Rather, "[h]e was just saying like look, you know, she knows more about SnapChat than their so-called expert." Moreover, the court noted that "the jury instructions just tell them to consider an expert just like any other witness."

We find no abuse of discretion in the court's rulings. We first note that, from our reading, Lubben's testimony about how Snapchat works was fairly technical and, therefore, was the type of evidence that an expert might provide. *See* Iowa R. Evid. 5.702 (permitting qualified experts to provide testimony based on scientific, technical, or specialized knowledge). So the defendants might have raised objections based on the McQuillens' failure to timely disclose Lubben as an expert, or perhaps on the basis of Lubben's qualifications. As it turned out, though, all of Lubben's testimony—including her technical analysis of how Snapchat works—came in without objection.

In any event, we see no problem with the McQuillens' counsel describing Lubben as an expert on Snapchat. Because Lubben effectively testified as an expert, it is hard for us to see much problem in calling her one. We also defer to the district court's finding that the McQuillens' counsel wasn't trying to mislead the jury into thinking that Lubben held any special legal status as an "expert." And the "expert" reference seems especially innocuous in light of the jury instructions, which told the jurors to treat expert witnesses like all other witnesses. Beyond all of that, we note that digital forensics expert Lorencz was central to the defendants' effort to prove that Margaret was acting negligently by interacting with Snapchat. Surely it was fair game for the McQuillens to make arguments that might cast doubt on Lorencz's expertise with Snapchat—including

a comparison of his supposed expertise with that of Lubben, an everyday Snapchat user.

We affirm the district court's refusal to grant a mistrial on this basis. For the same reasons, we affirm the district court's refusal to grant the posttrial motion for new trial on this basis.

**C. Arguing Beyond the Specifications.** We turn now to the second ground for the defendants' mistrial motion—namely, the complaint that the McQuillens' arguments about negligence went beyond the specifications contained in the jury instructions.

As explained, the district court submitted three specifications of negligence against the defendants: (a) failure to yield the right-of-way upon a left turn; (b) failure to maintain a proper lookout; and (c) failure to discontinue operation of a vehicle under hazardous conditions. During closing argument, though, the McQuillens' counsel suggested that the jury could also find that Takes was negligent because he had exceeded the speed limit earlier that day, he had failed to plan a route that would minimize unprotected left turns, or he had violated a company policy as to where he could park his truck. Defense counsel did not object to these suggestions while the McQuillens' counsel was arguing. But, at the next break, defense counsel objected that the McQuillens' arguments "do not match the specifications of negligence" and noted the parking issue as an example. Counsel raised this as a second ground for mistrial.

The district court agreed that "part of" the McQuillens' argument "was improper" because it suggested that the jury could find negligence on grounds other than those stated in the specifications. Ultimately, though, the court did not think a mistrial was appropriate. For one thing, given the timing and nature of the misconduct, the court thought the defense could clarify the actual limits

of the specifications in its closing argument. Also, the court did not think that the McQuillens' arguments involved any "intentional misleading" of the jury. The court also emphasized that there were only "a few things" in the argument that were concerning, and those constituted "a fairly small portion" of the total argument. Meanwhile, "the vast majority of the closing argument was appropriate" and "had some relation" to the actual specifications given.

Similarly, in its ruling on posttrial motions, the court again acknowledged that parts of the McQuillens' argument had been improper. At the same time, the court again declined to grant a new trial because "the Court [could not] find that it is probable that the result of the trial would have differed absent the improper argument." The court again noted that the improper arguments "were a small portion of a lengthy closing argument." The court also emphasized that its written instructions—which the jury is presumed to follow—had provided the jury with the proper specifications of negligence. The court also noted that immediately prior to closing arguments, the court had specifically admonished the jury that closing arguments are "not evidence nor should they be construed by [the jury] as evidence or instructions on the law." (Alteration in original.) The court added that although the defendants' posttrial motion complained that the court should have given some additional curative instruction, such as a specific direction to disregard parts of the McQuillens' arguments, the defendants had not asked for that kind of instruction during trial.

Following our review, we find no abuse of discretion in the court's rulings. On the one hand, the record supports the court's determination that some parts of the McQuillens' argument were improper. On the other hand, though, we find no abuse of discretion in the trial court's finding that—given the totality of the circumstances at trial—"a different result" would not "have been likely but for"

the improper parts of the argument. *Olson*, 999 N.W.2d at 300. *Compare Olson*, 999 N.W.2d at 300 (considering the entirety of the arguments and the court's curative warning to determine that the improper arguments were not prejudicial), *with Kinseth*, 913 N.W.2d at 73 (holding that a new trial was warranted when the improper arguments formed an "inescapable theme"). Accordingly, we decline to reverse the court's refusal to grant mistrial or its later refusal to grant a new trial.

**D. Present Value.** Finally, we consider the defendants' argument that the district court abused its discretion by preventing the defense from making arguments about the time value of money. *See Lane v. Coe Coll.*, 581 N.W.2d 214, 218 (Iowa Ct. App. 1998) (reviewing limitations on closing argument for abuse of discretion). We find no grounds for reversal here.

The time value of money—or TVM—"is a core financial principle that states a sum of money is worth more now than it will be in the future." Catherine Cote, *3 Financial Principles Every Professional Should Know*, Harv. Bus. Sch. Online (Apr. 12, 2022), https://online.hbs.edu/blog/post/finance-principles [https://perma.cc/C984-V7DV]. TVM was relevant in this case. The jury was instructed that it must apply the familiar TVM concept of "present value." Specifically, the instructions said that "[f]uture damages must be reduced to present value," which the instructions defined as "a sum of money paid now in advance which, together with interest earned at a reasonable rate of return, will compensate the plaintiff for future losses." The McQuillens' forensic economist also provided testimony about the present value concept. And he offered specific present value calculations for certain future damage items, such as Margaret's loss of future earnings.

Given these instructions and evidence, the time value of money might well have been a proper topic of the defendants' closing argument. And if the district court had wholly prohibited the defendants from discussing the time value of money, that prohibition could very well have constituted reversible error, assuming that error was preserved. But that is not what we see in the trial record.

Here again we need to provide some additional background facts. Prior to trial, the McQuillens had moved in limine for a prohibition against the defense making any arguments about what a person might buy with the amounts of money that the McQuillens would ask the jury to award. The McQuillens relied on "golden rule" precedents and asked the court to bar the defense from arguments that would lead "the jury to imagine how they might spend the sums requested by [the McQuillens]." The defendants resisted. They argued that the McQuillens' motion was "vague and enormously overbroad" and "[i]t is not clear exactly what [the McQuillens] intend to prevent in terms of closing argument." The court granted the motion in part while also expressing some uncertainty as to what arguments would or would not be allowed. Here's the relevant ruling:

> It is difficult to anticipate in limine what arguments will be made, or the precise wording of any such arguments. But, in light of the Court's concerns, to the extent that counsel wish to offer <u>an argument regarding what *plaintiff* could do</u> with the amount of money being requested, counsel shall first raise the issue with the Court outside of the presence of the jury.

(Underlining added.)

Fast forward to the defendants' closing argument, which was accompanied by a PowerPoint visual presentation. Toward the end of the argument, defense counsel put up slide 33 in their deck. Slide 33 was titled, "The time value of money." And it stated a number of assumptions and calculations. Important

here, slide 33 suggested that if the damages award were $3 million, "[a] person" could "[i]nvest this amount at 4.0% per year" and receive annual interest of "$120,000." "A person could live on" that "$120,000 per year, and spend it all," the slide observed. Meanwhile, the original principal would remain unspent.

When slide 33 came up before the jury, the McQuillens' counsel immediately requested a sidebar and asked for the slide to be taken down. The sidebar was not reported, and so, we have no transcript of what was said. But we are aided by some additional record that was made after the case was submitted to the jury. For starters, while the jury was deliberating, the defendants filed a bill of exceptions together with an affidavit signed by the defendants' counsel. The affidavit explained counsel's recollection of the sidebar. Later, the McQuillens' counsel also submitted a statement regarding what occurred at the sidebar. Finally, in an order addressing the bill of exceptions, the district court made findings as to what occurred at the sidebar. Those findings are not disputed on appeal. Here they are:

> Plaintiff's counsel objected after Defendant's counsel placed Slide 33 on the courtroom screen. An unreported sidebar conference was held, at which Plaintiff's counsel argued that the slide violated the Court's limine ruling. The Court agreed and indicated that this should have been brought to the Court's attention prior to showing the slide to the jury, in accordance with the limine ruling. The Court instructed defense counsel not to display the slide. *No additional restrictions were placed on defense counsel's closing argument during the sidebar.* Neither party requested that the Court make an immediate record on this issue or asked for a recess.

(Emphasis added) (footnote omitted).

We would add that there is no claim that the defendants made a motion for mistrial as part of the sidebar.

Returning to the trial: once the sidebar was complete, defense counsel continued on with closing argument. Notably, counsel said little more about

damages except that "[t]here was a lot of medical and damages testimony." Counsel did not discuss the time value of money in general or the particular issue of present value.

Once the defendants' closing argument was complete, the trial proceeded directly to the McQuillens' rebuttal arguments. These were followed immediately by the reading of the last few jury instructions and, finally, the submission of the case to the jury. Defense counsel did not ask for an additional opportunity to make record prior to submission of the case to the jury.

After the case was submitted, counsel and the court made additional record outside the jury's presence. This record addressed the parties' agreement to a sealed verdict as well as the court's expected procedure for handling any questions that might arise during deliberations. The court repeatedly asked if the parties would like to make any other record. Defense counsel raised no concerns about the sidebar or any restrictions that had been imposed on defense counsel's argument.

All of that happened on June 7, a Friday. On the following Monday, June 10, defense counsel submitted the already-described bill of exceptions and accompanying affidavit. The bill of exceptions did not include any request for relief. Later that day, the jury returned its verdict.

On July 1, the defendants filed their motion for new trial. Among other things, the defendants claimed the court "committed error when it prevented defense counsel from making certain impactful damages arguments"—specifically, an argument about the time value of money. The district court rejected this argument.

Now, on appeal, the defendants ask us to reverse because "[t]he district court . . . prohibited the defense from discussing the time value of money in any

way." We reject this argument for two interrelated reasons. First, error was not preserved. "The doctrine of error preservation has two components—a substantive component and a timeliness component." *State v. Krogmann*, 804 N.W.2d 518, 523 (Iowa 2011). To meet the timeliness requirement, claims of errors during closing arguments must be urged not later than "the close of the argument in motion for mistrial made before submission to the jury." *Kinseth*, 913 N.W.2d at 67 (quoting *Andrews v. Struble*, 178 N.W.2d 391, 402 (Iowa 1970)). This gives the trial court an opportunity to take corrective action before it is too late. *See Olson*, 999 N.W.2d at 299. It also "discourag[es] parties from engaging in a 'wait-and-see' approach by holding off objections . . . until after the jury returns the verdict." *Id.*

Here the claimed error is that the district court categorically prohibited the defense from discussing the time value of money. This error was not timely raised at trial. It was not raised during the sidebar, where the district court only ordered that the defense could not use slide 33 and imposed "no additional restrictions" on the defense's argument. Nor was it raised at "the close of the argument in motion for mistrial made before submission to the jury." *Kinseth*, 913 N.W.2d at 67 (quoting *Andrews*, 178 N.W.2d at 402). Rather, it was raised for the first time in the defendants' motion for new trial. This was too late to preserve an alleged error concerning closing argument. *See id.*

Second, as already suggested, we do not think that the district court committed the error claimed now, that is, prohibiting the defense from discussing the time value of money. Although the district court prohibited the defense from using slide 33, no other prohibitions were imposed. Rather, it seems that after the sidebar, the defense simply made a strategic choice to focus on other topics.

**V. Conclusion.**

We deny the McQuillens' motion to dismiss this appeal. Accordingly, we have considered the merits of the defendants' arguments for reversal. Ultimately, we find no abuse of discretion by the district court. Therefore, we affirm.

**Motion to Dismiss Appeal Denied; District Court Judgment Affirmed.**