# IN THE COURT OF APPEALS OF IOWA

No. 21-0915
Filed July 20, 2022

**C2P PIGS, LLC and C2P PIGS/KINGSLEY, LLP,**
    Plaintiffs-Appellees,

**vs**.

**DONALD M. FEDIE and AGRI CONTROL COMPANY, INC.,**
    Defendants-Appellants.

Appeal from the Iowa District Court for Sioux County, Duane E. Hoffmeyer, Judge.

The defendants appeal the jury's findings that the company breached a contract, both made fraudulent misrepresentations, and both breached a fiduciary duty; they also appeal the combined judgments against them for $960,000. **AFFIRMED.**

Robert B. Deck, Sioux City, for appellants.

Daniel E. DeKoter and Brandon J. Krikke of DeKoter, Thole, Dawson, Rockman & Krikke, P.L.C., Sibley, for appellees.

Heard by May, P.J., and Greer and Chicchelly, JJ.

**GREER, Judge.**

This civil case involves disputes between some corporations, limited liability companies, individuals, and a partnership involved in a business venture of purchasing, feeding, and selling pigs.

Generally, C2P Pigs, LLC (C2P)[1] was responsible for providing funding for the purchase of pigs, and Kingsley Livestock Producers L.L.C. (Kingsley Livestock) was responsible for funding the expenses necessary to finish and sell the pigs. C2P and Kingsley Livestock entered into a limited liability partnership agreement, which formed C2P Pigs/Kingsley LLP (the partnership). In turn, the partnership entered into a management services agreement with Agri Control Company, Inc. (Agri Control),[2] which was responsible for overseeing the actual purchasing, growing, and selling of the pigs, plus the recordkeeping and accounting that went with it. After the venture failed, this lawsuit followed.

As it pertains to the parties and claims left on appeal, C2P and the partnership brought suit against Agri Control and Donald Fedie, who is the sole shareholder of Agri Control. The plaintiffs alleged that Agri Control breached the management services agreement it entered into with the partnership, Agri Control and Fedie made fraudulent misrepresentations to C2P and the partnership, and Agri Control and Fedie breached their fiduciary duties to C2P and the partnership. The jury found in favor of the plaintiffs on each claim, awarding C2P $300,000 and the partnership $660,000.

---

[1] C2P is a limited liability company with shareholder Center Feed Store, Inc. and other investors.
[2] Agri Control is an Iowa Corporation that does business in Sioux County.

On appeal, the defendants argue that either their motion for directed verdict or their motion for new trial should have been granted on two of the underlying claims—they do not contest that Agri Control breached the management services agreement. They also challenge some jury instructions, the award of damages, and the jury's decision that Agri Control's corporate veil should be pierced to make Fedie personally responsible for the breach-of-contract judgment against Agri Control.

**I. Background Facts and Proceedings.**

As part of its normal business operation, Center Feed Store stores corn for farmers, which it will then grind, mix with soybean meal and mineral mix, and deliver back to the farmers to feed their livestock. At times, Center Feed Store also joined with farmer-customers in the ownership of pigs.

The limited liability company C2P came about because of a weak market for corn. Some farmers decided "they'd rather feed [their corn] through pigs than hauling [the corn] to town. So that's how [they] came up with corn-to-pork concept."

Dean Dekkers is an employee of Center Feed Store, of which his father, Howard Dekkers, is the principal owner, operator, and shareholder. With the goal of making the "corn to pork" concept a reality, Dean was put into contact with Donald Fedie in approximately July 2014. At this point, Fedie was already the principle shareholder of Agri Control and a shareholder and president of Kingsley Livestock. After speaking with Dean about the concept, Fedie gave the Center Feed Store and various farmers who were considering partnering up a thirteen-page document titled "A Hog Finishing/Marketing Investment Opportunity." The beginning of the document states, "Agri Control Co in conjunction with Kingsley

Livestock is actively in the market sourcing weaned pigs and feeder pigs to place on feed as partners-in-feeding or on a fee basis." It included information about sourcing pigs, nursery facilities, finishing facilities, a sample feeding progress report, a sample field report, and a marketing schedule. It also included information about Kingsley Livestock, including that it had been involved in livestock feeding since April 2011 and had a "$1,500,000 Line-of-Credit." The document stated Kingsley Livestock had "entered into a management agreement with Agri Control" and that Agri Control would "hire all administrative personnel, be responsible for performing all internal accounting, the collection of receivables and payment of payables, . . . the preparation of all internal financial statements and reports to the Board and the supervision and reporting of all payments to the Board of Managers and affiliates."

Some farmer-investors and Center Feed Store decided to partner with Kingsley Livestock in carrying out the corn-to-pork concept. At Fedie's suggestion, the farmers and Center Feed Store formed the limited liability company C2P, with Dean as president and Center Feed Store as managing member, in December 2014. According to Dean's later testimony, there were fifteen shares of C2P, with each share costing $25,000. Center Feed Store purchased 8.5 shares and other farmer-investors purchased the rest, for a total investment of $375,000 to purchase pigs. The farmer-investors of C2P also sold their corn to Center Feed Store and were paid an additional $.20 on each bushel over the average monthly price as part of the incentive to invest. The farmer-investor's corn was mixed into feed and then the partnership purchased it to feed the partnership's pigs.

In January 2015, C2P entered into a limited liability partnership agreement with Kingsley Livestock.  Dean signed on behalf of C2P and Fedie signed on behalf of Kingsley Livestock.   Under the partnership agreement, C2P agreed to "contribute . . . the capital necessary to purchase approximately 2,500–2,800 head ('Draft') of feeder pigs ('Pigs') every six to seven weeks . . . ."  Kingsley Livestock was responsible for "contributions in the amount necessary so the Partnership has sufficient funds to pay for all expenses related to finishing the Pigs, including, but not limited to: purchasing feed, leasing finishing barns, and reimbursing the cost of corn purchased by Center Feed Store, Inc . . . ."  As Dean testified, "C2P Pigs were to pay for the pigs, Kingsley Livestock Producers was to pay the running expenses" and profits and losses were to be divided 50/50.

Then the partnership entered into a management services agreement with Agri Control.  Dean signed on behalf of the partnership, and Fedie signed on behalf of Agri Control.   The management agreement stated "the Partnership [was] engaged in the business of the purchase, housing and care, feeding and growing and the sale of mature livestock (swine) for harvest" and was retaining Agri Control to perform specific services, namely:

> (a) Develop policies to further the commercial, financial, administrative, or other activities of the Partnership;
> (b) Carry out the purchase and sale of livestock;
> (c) Create and implement a future market strategy;
> (d) Acquire all goods, services, and supplies as may be reasonably necessary to assist in the day-to-day operations of the Partnership;
> (e) Administer all funds received by the Partnership, and establish and maintain one or more bank accounts, which Partnership funds shall be turned over to the Partnership on the termination of the Agreement;

     (f) Maintain accurate and complete financial records, kept in accordance with generally accepted accounting principles, showing all Partnership assets, liabilities, income, and expenditures;

     (g) Prepare balance sheets and income/expense statements at the end of the fiscal year and after every sale of livestock for delivery to the Partnership within thirty (30) days after the close of the relevant period;

     (h) At any reasonable time, inspect and copy any records held by the Partnership;

     (i) Determine appropriate staffing levels, selection, employment, training, termination of employment, salary and wages;

     (j) Report regularly to the Partnership and its board members, and on an as requested basis; and

     (k) Carry out and represent the Partnership in connection with its daily management activities.

The operation began with its first group of pigs in 2015. The pigs were being fed with feed from Center Feed Store, and Center Feed Store sent monthly bills to Agri Control with the amount owed.

The venture continued, with Dean and the farmer-investors in C2P meeting with Fedie twice a year to get financial information about how the partnership was doing. They met to discuss the December 31, 2015 financials report and were given a one-page document—just an overview of general assets and liabilities, which did not include bank account statements or itemized transaction details. The December 31, 2015 report showed a net income loss of $105,236; the partnership made a capital call, requiring Kingsley Producers and C2P to put another $52,618 into the partnership to divide the loss 50/50. C2P rounded up the money from its shareholders and sent the $52,618 to Kingsley Livestock.

By the fall of 2017, the partnership had accumulated more than $670,000 in feed bills at the Center Feed Store that Agri Control had not paid. Around the same time, Scott Schmidt, an investor in C2P who also had his own farm

operations,[3] was told by a couple local veterinarians that the partnership had outstanding bills with them. Dean met with Fedie, as the representative of Agri Control, one or two times at the end of 2017 to discuss the outstanding bills and how they would get paid. In October 2017, an attorney for Center Feed Store sent a letter to Fedie about the unpaid feed bills, explaining that Center Feed Store intended to put an agricultural lien on the partnership's pigs to recover its fees when the animals were sold. Fedie responded with an email to Howard Dekkers, outlining a schedule for the partnership's planned payments to Center Feed Store. Fedie indicated the partnership planned to pay approximately $200,000 in November, approximately $120,000 in December, and approximately $200,000 in January.

Fedie wanted to make another capital call, stating he needed more than $300,000 from C2P. According to Dean, Fedie did not intend to ask for more capital from Kingsley Livestock. Dean rejected the idea of C2P putting in more capital, suggesting the financial reports did not support the need for an infusion of more capital and they needed to "get to the bottom of it."

Dean and Howard Dekkers met with Fedie and an investor in Kingsley (along with the respective attorneys) to discuss "[w]hy the books were so far off." The group decided to hire an accounting firm "to get the financials up to date and correct."

According to Heath Baker, the certified public accountant (CPA) hired by the group:

---

[3] Some of Schmidt's farming ventures were conducted through a corporation. The distinctions are not important for this case.

[I]t was determined that the current books in place were hard to understand, and there wasn't a lot of confidence in the numbers, and what was on paper didn't match up with . . . people's understandings of their operation, and so ultimately my recollection was, well, in order to decide how to move forward, we need to understand what the actual numbers and where this operation is really at.

Baker worked with Pamela Lostroh to obtain the source documents needed to "recreate the books" of the partnership, including "bank statements, loan line-of-credit detail, commodity account statements, . . . folders with details of the different hog groups [and] sales of the pigs," and information about the expenses related to finishing the pigs. The bank account statements showed the account was in the name of Kingsley Livestock, and not all of the transactions were related to the partnership. Agri Control was using QuickBooks—an accounting software—to track the partnership's transactions, and Baker was also given that QuickBooks file.

Baker's analyzed the books "on a cash basis,[4] which means checks in, for example, are income: Checks out are expenses. If there's payables, or unpaid bills, the cash hasn't moved yet to pay those bills, so those haven't been reflected

---

[4] Agri Control kept the books on an accrual basis. According to their witness, CPA Prosser

A cash basis is basically money in, money out; checks written and deposits made. Accrual basis is going to introduce the concept of receivables, that is, potentially sales that have occurred but have not been converted to cash yet, and then the other side, accounts payable, would represent bills that have been incurred, the product or the service has been rendered, but again has not been paid for.

And inventories would be another example where money has been expended, but the matching concept with the expenditure and the resulting income has not happened yet, so the inventory represents assets expended to generate that inventory. The movement of that inventory to a profit-and-loss sheet would be connected to the sales of those inventory.

in the QuickBooks file." Based on his analysis, the partnership's cash loss was at approximately $570,000. Plus, there was outstanding bills (where no check had yet gone out) totaling an additional approximately $660,000. He estimated the partnership's total loss at $1.23 million.

The partnership members stopped doing business together in December 2018, and the partnership was dissolved in July 2019. This lawsuit followed in September. C2P and the partnership sued Kingsley Livestock, Fedie, and Agri Control. Kingsley Livestock never responded, and default judgment was ultimately entered against it before trial.[5] In the remaining claims, C2P and the partnership alleged (1) Agri Control breached the terms of the management services agreement, damaging the partnership; (2) Agri Control and Fedie made fraudulent misrepresentations to C2P at the time C2P entered into the partnership with Kingsley, which damaged C2P; (3) Agri Control and Fedie breached fiduciary duties owed to both C2P and the partnership, which damaged each plaintiff; and (4) Fedie used Agri Control "as a mere shell, serving no legitimate business purpose," so plaintiffs should be allowed to pierce the corporate veil and any judgment in favor of the plaintiffs against Agri Control should be ordered against Fedie.[6]

---

[5] The plaintiffs alleged Kingsley Livestock breached the partnership agreement it entered into with C2P by failing to perform its obligations as outlined in the agreement, made fraudulent misrepresentations about the line of credit it could access, and breached a fiduciary duty it owed C2P and the partnership. The plaintiffs obtained a default judgment against Kingsley Livestock in the amount of $576,751.90 plus interest. Kingsley Livestock did not appeal and is not a party to this appeal.

[6] Additionally, Agri Control brought several counterclaims against C2P. It alleged (1) Agri Control was a third-party beneficiary to the partnership agreement between C2P and Kingsley Livestock and that C2P breached the partnership

A four-day jury trial took place in March 2021. Baker, the CPA hired to explain the irregularities in the partnership's books, testified at length. Baker described taking the information from the various financial reports Fedie (acting for Agri Control) gave to C2P—the one-page spreadsheet documents—and compared it to data in the QuickBooks file that was kept for the partnership by a bookkeeper[7] in Fedie's office. For example, the year-to-date financial report from July 31, 2016, showed the partnership had a net income of $84,227, while the bookkeeper's QuickBooks file showed the partnership had lost $193,065—a discrepancy of $277,292. As of December 31, 2016, the financial report from Agri Control to C2P stated that, year to date, the partnership had net income of $8232, while the QuickBooks file showed the partnership lost $533,321—a discrepancy of $541,553. Baker did a similar comparison of the partnership's total equity— comparing what Agri Control reported to C2P in the financial reports and what the QuickBooks reports showed. As of July 31, 2017, for example, the Agri Control

---

agreement, which caused Agri Control damages and (2) C2P tortiously interfered with Agri Control's business. Additionally, Agri Control brought a counterclaim against both C2P and the partnership, alleging Agri Control paid $167,125 for pigs for the partnership, $66,397 of which was the responsibility the partnership. The district court granted the plaintiffs' motion for directed verdict as to the second claim—that C2P tortiously interfered with Agri Control's business. The jury found that C2P breached a contract with Agri Control, but it awarded $0 in damages. Agri Control did not appeal this ruling; it is not an issue on appeal.

Agri Control also brought suit against third-party defendants Center Feed store, Inc; Howard Dekkers; and Dean Dekkers. Agri Control alleged Center Feed, Howard, and Dean "conspired with and engaged in conduct . . . to tort[i]ously interfere with the business and contracts of Agri and defraud Agri." The district court granted a directed verdict in favor of the third-party defendants on this claim before it went to the jury. Agri Control does not appeal that ruling.

[7] More than one person acted as bookkeeper for the partnership from 2015 to 2018. It seems the duty largely fell upon the person(s) who were in charge of keeping Kingsley Livestock's books, not the person hired to keep Agri Control's books—Pamela Lostroh.

financial report stated the partnership had $485,625 in total equity, while QuickBooks showed the partnership had a negative $196,007—a difference of more than $680,000. Finally, Baker compared the inventory costs as reported to C2P and what the QuickBooks file showed. As of July 31, 2017, Agri Control reported $2,055,868 of inventory costs, while QuickBooks showed $667,442 in inventory costs—meaning Agri Control over-reported inventory costs by nearly $1.4 million.

Agri Control also kept "close out" data on each group[8] of pigs it purchased, finished, and sold. Each group was given a number when it started—the first group was 1001—and then tracked as a single entity regarding purchase cost, cost to feed them, veterinary and housing expenses, etc. in comparison to the amount for which the group was ultimately sold. Baker took the close-out amount from each group that was in the QuickBooks file kept by the bookkeeper and compared it to the data from the QuickBooks file he made using the source data. He compared the data from eighteen separate groups and found discrepancies as large as $128,538 for a single group. For example, for group 1005, Agri Control reported a close-out profit of $41,920, while Baker's QuickBooks file showed a close-out loss of $84,457—a discrepancy of $126,377. Over the eighteen groups, Agri Control reported the partnership lost $108,170, but Baker's QuickBooks file showed the loss was $761,168—more than $650,000 difference.

Baker opined that, based on his reconstruction of the partnership's financials, the partnership lost approximately $1.2 million over the life of the

---

[8] According to Dean's testimony, the number of pigs in a group can vary, and in this case "[i]t was anywhere from 3600 to 1200" per group.

partnership—assuming all of the outstanding bills got paid. He testified his analysis was done on a cash basis and included a loss of $570,000 with about $660,000 in outstanding payables or debt,[9] to total $1.2 million. The reports from the QuickBooks file kept by the bookkeeper showed a total loss of $1,029,192.

The plaintiffs' attorney asked Baker, "When you were working on the closeout section of your work that we talked about a moment ago, did you reach any conclusions about what could have been done had someone decided to stop this relationship at the end of 2015?" He responded, "Yeah. So . . . had the closeouts showed the losses, significant losses, at that point in time, I would conclude that a person would reanalyze whether they wanted to continue participating in a partnership losing that much money or restructure it or trying to figure out how to turn it around." Baker testified that, based on his understanding, it took roughly six months to finish a group of pigs after purchasing them, and if the partnership decided to stop purchasing more pigs at the end of 2015, then "groups 1001 through 1007 would have had to have been fed out, and the total estimated losses based on those groups would have been 500,000 roughly and avoided the additional 700,000 of losses after that."

Baker noted that Kingsley Livestock used a single bank account; it did not have a separate account for the partnership. The account was used for "6 to 7 million of other sales and 6 to 7 million of other expenses related to non-[partnership] operations in [the] account." Someone from Fedie's office went through the statements and identified which transactions related to the partnership

---

[9] Of the $660,000 owed by the partnership, approximately $570,000 was an unpaid bill to Center Feed Store.

and which were for Kingsley Livestock.  Based on the other person's identification of the various pertinent transactions, Baker attempted to determine "what money [was] contributed to the [partnership] by the two partners."  He concluded C2P contributed $530,802.01 to the partnership, while Kingsley Livestock contributed only $37,702.85.  The partnership had outstanding debt of $660,404.64, and to pay back that amount and get to the point where the partnership's losses were shared equally, C2P would need to put in another $83,652.74 while Kingsley Livestock owed another $576,751.90.

Finally, Baker testified that Kingsley Livestock's $1.5 million line of credit—which was mentioned in the thirteen-page document titled "A Hog Finishing/Marketing Investment Opportunity" that was given to Center Feed Store and farmers before they formed C2P—already had approximately $900,000 borrowed against it at the time the partnership began.  In other words, Kingsley Livestock had only $600,000 available when it entered the partnership with C2P.

On rebuttal, Baker was asked to review exhibit 16, which was a financial report that had been given to the C2P investors.  The document purported to show the financials of the partnership as of December 31, 2015.  According to Baker, although there was testimony the reports were done on a cash basis—which Fedie suggested explained the discrepancies between what the investors had been told the venture lost and what the debt actually was—this report was actually done on an accrual basis because it included an "accounts payable" section.  But the December 15, 2015 report only showed an income loss of $105,236, while the QuickBooks report from the same period—also done on an accrual basis—showed a loss of $300,000.

Mary Hubers, the bookkeeper of the Center Feed Store until she retired in June 2018, testified at trial. She testified about Center Feed Store's bookkeeping system and how, when farmers ordered feed, they would tell her how much they needed, what group it was for, and to which building it needed to be delivered. She remembered instances of Scott Schmidt calling in and ordering feed for Dean's pigs, which Dean owned separately from the pigs owned by the partnership. Although both had pigs at buildings owned or run by Schmidt, the two sets of pigs were kept in separate buildings and the feed orders for them came in separately. She also testified about the partnership's unpaid feed bills:

> When it first started, the checks came in. It was, like, on time at first, and every month it seemed to get a little slower, and then the checks would come, and they weren't—I had no idea what they were paying me for, which group of hogs. It was, like, one check, and it was a lump sum that I thought, what in the world? Where is this sum coming from? I couldn't figure out what the sum was from, so I talked to Dean. I said, Dean, I don't know what they're paying here. So then sometimes Dean would either call [Agri Control in] Sioux Falls and, he said, you can call to Sioux Falls, see if you can figure out which ones they're paying, so I did that a couple times, and it just slowly got slower and slower and less and less and then pretty soon we were getting no checks.

Pamela Lostroh worked as a receptionist for Agri Control for a couple of years in the early 2000s. In 2004 or 2005, she started working with Brandon Bookkeeping L.L.C., which was doing the bookkeeping for Agri Control. Lostroh took over those duties, and she continued to be responsible for Agri Control's bookkeeping at the time her trial deposition was taken in October 2020. She was also asked to help with Kingsley Livestock at two separate periods when its bookkeeper left: from March to May 2017, she paid Kingsley Livestock's bills, and from February to September 2018, she was responsible for the bookkeeping of

Kingsley Livestock. During these same times she was responsible for Kingsley Livestock's bookkeeping, she was also responsible for the bookkeeping of the partnership. According to Lostroh, after she was responsible for paying Kingsley Livestock's bills from March to May 2017, she questioned the accuracy of the books and mentioned it to the Kingsley Livestock's normal bookkeeper, who then went back and reconciled some transactions.

Don Cudmore was employed to oversee the partnership's pigs. Cudmore would check the barns weekly to see how the pigs were doing, barn conditions, and if the pigs needed medicine or were getting sick. He testified as to the steps he took to complete "closeouts" on every group of pigs and that he gave documents to Fedie showing how many pigs were purchased; their quality; the amount spent on food, medicine, and care; and then the amount the pigs were ultimately sold for.[10] At times, Cudmore also spoke with Fedie about the closeouts when he handed the documents in.

Cudmore understood the purpose of the closeout was "to supply the shareholders with information so that they knew what was going on with their investment and knew what was going on with their pigs." Cudmore testified he attended a partnership meeting in 2016 or 2017 where Fedie presented information on the venture to the C2P investors. Cudmore was "quite surprised" about the information that was being conveyed because Fedie "presented a bunch of numbers that really made one think that this—this thing was going pretty well," but "doing closeouts," Cudmore "didn't see that money. [He] didn't see that kind

---

[10] Closeouts were prepared for each group of pigs. The pigs were fed for 180 days before being sold, and closeouts are completed after the sale.

of profitability." Cudmore contrasted the profits that were being reported to the C2P investors with conversations he had with suppliers—like the pig suppliers and Center Feed Store—who complained to him about the partnership's unpaid bills, and with Kingsley Livestock's bookkeepers, who told him there was not money to pay the feed or veterinary bills. According to Cudmore, the factors influencing the profitability of the partnership were the quality of pigs the partnership received, a problem with a large percentage of the pigs dying before they were sold,[11] the market fluctuations, and that the operation was undercapitalized. Ultimately, Cudmore decided "this [was] not anything [he] wanted to be involved in," and he quit his job.

Fedie was called by the plaintiffs and testified by deposition. He stated that the documents that were handed out to the C2P investors at the twice-annual meetings were prepared by the bookkeeper, who would "go to the Quickbooks accounting system and use the accounting system, which they have sitting in front of them, to prepare an outside balance sheet and income statement." The documents were "printouts from an Excel computer system"—"not printouts from a QuickBooks system." Fedie testified he reviewed the reports before giving them to the C2P investors.

When called by the defendants, Fedie testified C2P was supposed to be formed with initial capital of $375,000 but Dean was struggling to round up enough investors and capital, so it actually started with $200,000 and $70,000 from Kent Feeds; only $270,000 was released from the escrow account on January 1, 2015

---

[11] Cudmore agreed the percentage of pigs dying was "sometimes . . . as high as ten percent."

as the original capital input. Fedie blamed this "undercapitalization" for the failure of the venture, argued it constituted nonperformance by C2P under the contract, and claimed C2P had not yet covered its share of the partnership's losses. But, on cross-examination, Fedie was reminded of his deposition testimony, when he said that C2P "originally transfer[red] . . . some $400,000" to the partnership's account.

Fedie denied Kingsley Livestock only ever contributed $37,702.85 to the partnership. In support of his denial, he testified the line of credit had approximately $333,000 drawn on it as of June 30, 2015 and $824,000 drawn on it as of June 30, 2017. According to Fedie, the partnership was doing well in 2017 based on contracts he negotiated for selling the pigs, with "$600,000 turnaround from loss to profit." But Kingsley Livestock's line of credit came due at the end of 2017; Kingsley Livestock had drawn the entire $1.5 million line of credit. For the bank to increase the credit line, the partnership needed to "sign a UCC agreement which would give [the bank] a lien against the hogs being sold in the partnership" and complete a capital call to pay the bank for the cash lost by the partnership up to that point. Fedie testified neither occurred because C2P would not agree to the terms. Fedie, on behalf of Kingsley Livestock, thought the terms were acceptable because "[b]ased on results from 2017, it was sure obvious that with the contracts that [the partnership] had in place, [it] had a much better opportunity to make a profit than before." Without the line of credit being extended, the partnership "essentially collapsed."

Fedie testified that while two different operations used the one bank account, "[e]ach business had their own separate accounting system and the funds

were applied to each separately, as they were supposed to be." But Fedie admitted there were bookkeeping errors along the way, which began "during the middle part of 2016." According to Fedie, some of the vendors—like veterinarians—were not dividing up expenses between the partnership's bills and individual members' bills. This was a small part of the problem.

> The big part of it is the fact that the hogs were being sold through the same brokerage company . . . that the partnership was selling through, . . . and I don't know why, but they continually got everything mixed up . . . and part of the problem was the fact that . . . I know of at least a few loads of hogs that went in with some of the partnership hogs in one part of the truck and [hogs Dean owned personally] in the other part of the truck. And, of course—and then the check, when it came in from [the brokerage company], would you believe was entirely 100 percent made out to [Kingsley Livestock], which was collecting all of the funds.
> And so then we had to go back through all of those things and finally got to the point at the end of 2016, where I cornered the bookkeeper because I had just put together some information for a meeting with Dean Dekkers and the shareholders that was grossly wrong, and I got together with the bookkeeper and I said, What's going on here? And we went through the first three months of 2017 and I said, We're going to have to go through a complete audit, and we're going to go all the way back to January 1 of 2015, and take a look at every single transaction that went through the account and see how—and see what's wrong with it, which, of course, at that point she promptly left and took her accounting notes with her.
> So we had to start over with a new—a very good bookkeeper, who had a lot of experience in auditing, and we had to go through a complete audit procedure through the balance of 2017 . . . on behalf of the partnership and C2P . . . . [W]e finally got the audit completed and got the corrections made to the accounting system by the second week of January, 2017.

Fedie admitted that the C2P investors were given some inaccurate reports. He testified he never informed the investors of the errors or provided them with the correct numbers because "[he] was never given permission to do that. [He has] never talked to the shareholders since the first of January, 2018." Fedie said 2000–3000 head of hogs were applied to the wrong account, but he never had any

intention of producing incorrect figures to the investors. Fedie testified he had a medical issue in late 2016 and early 2017, which led his doctor to prescribe him Oxycodone. That "result[ed] in some addiction" until "[p]robably August 2017."

During Fedie's testimony, he was also asked about a salvaged boat Agri Control bought for $94,900. It also paid for a docking fee in Florida, repair and maintenance, and boat insurance. The corporation also paid for a motor home, repairs and maintenance, fuel and utilities. Fedie testified these were business expenses; he traveled for the corporation and used the motor home to stay in rather than hotels. He testified he used the boat to entertain clients and prospective clients. Fedie testified he used the boat personally as well but claimed he covered his own expenses on those outings.

Dean Dekker also testified, claiming if C2P was told the partnership had lost $300,000 at the end of 2015, C2P would not have participated in the capital call; it would have finished out with the pigs they had and then been done. On rebuttal, Dean was asked about a new exhibit, which he testified was a bank statement for C2P—an account he opened in January 2015. The bank statement showed credits or deposits of $375,000, which Dean testified was the money he collected from the C2P investors that went through escrow. Then, once the partnership agreement and master services agreement were signed on January 19, 2015, the money was released from escrow and a check was sent to C2P to deposit in its checking. The statement also included a picture of a check that was written on January 19, 2015 for $375,000 to "Escrow Account for C2P Pigs, LLC"—showing how the $375,000 got into the account.

The case went to the jury, which returned the following verdict:

1. Do you find by a preponderance of the evidence that Agri Control <u>breached a contract</u> with C2P Pigs/Kingsley as explained to you in these instructions? (Mark one.)

   Yes_____ X _____          No_____

   (If your answer is "yes," answer Question 2, Question 6 and Question 7. If your answer is "no," go to Question 2).

2. Do you find by clear, satisfactory and convincing evidence that <u>Agri Control</u> made <u>fraudulent misrepresentations</u> to either of the plaintiffs as explained to you in these instructions? (Mark one.)

   C2P Pigs                Yes_____ X _____          No_____
   C2P Pigs-Kingsley       Yes_____ X _____          No_____

   (If your answer is "yes," answer Question 3 and Question 6. If your answer is "no," go to Question 3).

3. Do you find by clear, satisfactory and convincing evidence that <u>Donald Fedie</u> made <u>fraudulent misrepresentations</u> to either of the plaintiffs as explained to you in these instructions? (Mark one.)

   C2P Pigs                Yes_____ X _____          No_____
   C2P Pigs/Kingsley       Yes_____ X _____          No_____

   (If your answer is "yes," answer Question 4 and Question 6. If your answer is "no," go to Question 4).

4. Do you find by a preponderance of the evidence that <u>Agri Control breached fiduciary duties</u> to either of the plaintiffs as explained to you in these instructions? (Mark one.)

   C2P Pigs            Yes_____ X _____          No_____
   C2P Pigs/Kingsley   Yes_____ X _____          No_____

   (If your answer is "yes," answer Question 5 and Question 6. If your answer is "no," go to Question 5).

5. Do you find by a preponderance of the evidence that <u>Donald Fedie breached fiduciary duties</u> to either of the plaintiffs as explained to you in these instructions? (Mark one.)

   C2P Pigs            Yes_____ X _____          No_____
   C2P Pigs-Kingsley   Yes_____ X _____          No_____

   (If your answer is "yes," answer Question 6 and Question 8 If your answer is "no," go to Question 8).

6. If your answer is "yes," to Questions 1, 2, 3, 4 or 5 above, what is the amount of damage caused to the plaintiff?

Answer only for the specific cause of action and party you have identified by a "yes" answer in Questions 1 through 5 above. If the Plaintiffs have failed to prove any item of damage or have failed to prove that any item of damage was caused by the Defendants, enter 0 for that item.

| C2P Pigs | | C2P Pigs/Kingsley |
|---|---|---|
| $ N/A | Breach of Contract | $ 400,000 |
| $ 200,000 | Fraudulent Misrepresentation | $ 130,000 |
| $ 100,000 | Breach of Fiduciary Duty | $ 130,000 |
| $ 300,000 | Total Damages | $ 660,000 |

7. Do you find by a preponderance of the evidence that the corporate veil of Agri Control should be pierced to make Donald Fedie personally liable for the breach of contract by Agri Control as explained to you in these instructions? (Mark one.)

Yes____X____               No_____

(Answer this Question 7 only if Question 1 was "yes" and C2P Pigs/Kingsley was awarded damages in Question 6. If so, then go to Question 8.)

The district court entered judgment against Agri Control in favor of C2P for $300,000 and against Agri Control and Fedie, joint and severable, for the partnership for $660,000.

Later, Fedie and Agri Control moved for a judgment notwithstanding the verdict (JNOV). They argued (1) both defendants were entitled to directed verdicts dismissing the fraudulent-misrepresentation claims because there was insufficient evidence; (2) both defendants were entitled to directed verdicts dismissing breach-of-fiduciary-duty claims, claiming there was not sufficient evidence to establish that either defendant was a fiduciary or owed a fiduciary duty to the plaintiffs; (3) Fedie was entitled to a directed verdict regarding piercing the corporate veil; (4) both

defendants were entitled to a directed verdict on all claims because the plaintiffs failed to present substantial evidence as to any damages that were incurred; and (5) both defendants were entitled to directed verdicts on all claims asserted by the partnership because there was not sufficient evidence to prove the partnership "was, in fact, in existence."

The defendants also moved for new trial, asserting (1) the plaintiffs engaged in misconduct by misrepresenting that the partnership was an entity capable of pursuing a claim when, in fact, the entity was dissolved in 2019; (2) the damages awarded were excessive and appear to have been influenced by passion and prejudice; (3) the verdicts against the defendants were not supported by substantial evidence; (4) exhibit 86—the bank statement from C2P showing $375,000 was deposited in January 2015—was erroneously admitted because it was not on the plaintiffs' exhibit list; and (5) there was an irregularity in the jury instructions that misled the jury and invalidates its verdict on fraudulent misrepresentation.

C2P and the partnership resisted and, after a hearing on the motions, the district court denied both in their entirety. Fedie and Agri Control appeal.

## II. Discussion.

### A. Fraudulent Misrepresentation.

The jury found that both Fedie and Agri Control made fraudulent misrepresentations to both C2P and the partnership. In making its determination, the jury was instructed that the plaintiffs had the burden to prove all of the following:

> 1. (a) The defendants, on or about one or more of the following dates:
> October 31, 2015

December 31, 2015
July 31, 2016
September 30, 2016
December 31, 2016
July 31, 2017

made representations to C2P Pigs and C2P Pigs/Kingsley as to the income, expense, and assets of Kingsley Livestock; or

(b) The defendants, in August of 2014, represented that they had arranged a $1,500,000 line of credit to finance the hog venture with C2P Pigs.

2. One or more of the representations was false.

3. The false representation was material.

4. The defendant knew the representation was false.

5. The defendant intended to deceive either C2P Pigs, its members, or C2P Pigs/Kingsley.

6. Either C2P Pigs or C2P Pigs/Kingsley acted in reliance on the truth of the representation and was justified in relying on the representation.

7. The representation was a cause of the plaintiffs' damage.

8. The amount of damage.

**Directed Verdict.** The defendants argue the jury should not have been allowed to decide the fraudulent-misrepresentation claims because their motion for directed verdict should have been granted or, alternatively, the district court should have granted their motion for JNOV. They focus their argument on two representations: the December 31, 2015 financial report, stating it was not wrong or "false," it was just reported on a cash basis rather than an accrual basis; and the statement Kingsley had a $1.5 million line of credit exclusively for the use of the partnership, which they claim Agri Control and Fedie never said—C2P just assumed that the line of credit was exclusive to their partnership with Kingsley Livestock.

"A motion for [JNOV] is intended to allow the district court to correct any error in denying a motion for directed verdict." *Van Sickle Constr. Co. v. Wachovia Com. Mortg., Inc.*, 783 N.W.2d 684, 687 (Iowa 2010). "Accordingly, the motion for

[JNOV] must rely on the matters raised in a previous motion." *Id.* We review the denial of a motion for JNOV and the denial of a motion for directed verdict for correction of errors at law. *Id.*; *Crow v. Simpson*, 871 N.W.2d 98, 105 (Iowa 2015). "Our review is limited to those grounds raised in the moving party's motion for a directed verdict." *Pavone v. Kirke*, 801 N.W.2d 477, 487 (Iowa 2011).

"Our role is to decide whether there was sufficient evidence to justify submitting the case to the jury when viewing the evidence in the light most favorable to the nonmoving party." *Van Sickle Constr. Co.*, 783 N.W.2d at 687. "Each element of the plaintiff's claim must be supported by substantial evidence to warrant submission to the jury." *Id.* Evidence is substantial if a reasonable mind would find it adequate to support a finding. *Id.* "[W]e review the evidence in the light most favorable to the nonmoving party to determine whether the evidence generated a fact question." *Yates v. Iowa West Racing Ass'n*, 721 N.W.2d 762, 768 (Iowa 2006). "A party moving for directed verdict is considered to have admitted the truth of all evidence offered by the other party as well as every favorable inference that may fairly and reasonably be deduced from it." *McClure v. Walgreen Co.*, 613 N.W.2d 225, 230 (Iowa 2000).

The defendants focus on the December 31, 2015 financial report and the initial claim regarding the $1.5 million line of credit. They argue the plaintiffs were limited to these because their only evidence of "acting in reliance on the truth of the representation" was Dean's testimony—backed up by CPA Baker—that if C2P had known the partnership lost $300,000 in net income by the end of 2015, it would have ended the partnership and not participated in another capital call. We note the investors were also given a October 31, 2015 report, which predated the capital

call Dean testified C2P would not have participated in if it had known the true state of the financials.

The defendants maintain the December 31, 2015 financial report was not "false," it was just kept under a cash basis rather than an accrual basis—which is an appropriate way to keep books under generally accepted accounting principles. But this claim was contradicted by the testimony of CPA Baker. First, Baker testified that the December 31, 2015 financial report was not prepared on a cash basis; "[t]he fact that there's accounts payable would tell me it's based on an accrual basis." But also, Baker testified as to the "significant discrepancies" in the books kept by the bookkeeper and what was being reported to C2P. In the October 31, 2015 financial report given to C2P, Fedie—acting on behalf of Agri Control— reported the partnership had a net income loss of $61,799. But the partnership's books showed the loss was actually $114,038. At trial, Fedie offered no explanation why the report given to C2P included about half of what the partnership's books showed the loss was at that time. In considering whether the verdict should have been in favor of the defendants, we credit the testimony of Baker, as one of the plaintiffs' witnesses. *See McClure*, 613 N.W.2d at 230. There was substantial evidence the defendants made false representations to the plaintiffs before December 31, 2015, so the district court was correct to not grant the motion for directed verdict or JNOV.[12]

---

[12] Because the jury instruction is written as an "or,"—requiring the jury to find just one of the financial reports *or* the claim regarding the line of credit was a false representation—we do not consider the defendants argument about the line of credit.

**New Trial.** In the alternative, the defendants argue they should be granted a new trial on the plaintiffs' fraudulent-misrepresentation claim because the jury instruction was misleading. They argue the use of "the defendant" in the singular in paragraphs 4 and 5 "confus[ed] the jury and its verdict by implying that [it] only needed to make the findings against one of the [d]efendants rather than both of them."

But Fedie and Agri Control failed to object to this jury instruction before it went to the jury, so error is waived. *See* Iowa R. Civ. P. 1.924 ("[A]ll objections to giving or failing to give any instruction must be made in writing or dictated into the record, out of the jury's presence, specifying the matter objected to and on what grounds. No other grounds or objections shall be asserted thereafter, or considered on appeal."). And the defendants' contention they can raise the issue for the first time in a motion for new trial is incorrect. *See, e.g.*, *Julian v. City of Cedar Rapids*, 271 N.W.2d 707, 708–09 (Iowa 1978) (reversing the district court's grant of a new trial on grounds not raised before submission of instructions to the jury). "Iowa Rule of Civil Procedure 1.924 now makes clear that, with respect to jury instructions, untimely objections may not be considered." *Loehr v. Mettille*, 806 N.W.2d 270, 278 (Iowa 2011). "[F]ailure to make a contemporaneous objection will preclude a party from raising the matter on appeal if the motion for new trial is *denied*." *Id.* at 279. This comports with "the general rule that parties are not permitted to delay objections until it is too late for the problem to be corrected. Thus, errors to which objection could be made at trial may not be raised for the first time as grounds for new trial." *Rudolph v. Iowa Methodist Med. Ctr.*, 293 N.W.2d 550, 555 (Iowa 1980).

**B. Breach of Fiduciary Duty.**

The defendants argue the court should have granted their motion for directed verdict as to the breach-of-fiduciary-duty claims because neither Fedie nor Agri Control was in a fiduciary relationship with the plaintiffs.

"Some relationships necessarily give rise to a fiduciary relationship," such as "those between an attorney and client, guardian and ward, principal and agent, and executor and heir." *Kurth v. Van Horn*, 380 N.W.2d 693, 696 (Iowa 1986). There are other instances where fiduciary duties may not be automatically implicated by the type of relationship, yet "the particular facts and circumstances involved in" the case may give rise to a fiduciary relationship. *Weltzin v. Cobank, ACB*, 633 N.W.2d 290, 293 (Iowa 2001); *see also Kurth*, 380 N.W.2d at 696 ("Because the circumstances giving rise to a fiduciary duty are so diverse, any such relationship must be evaluated on the facts and circumstances of each individual case.").

Generally, "[a] fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Kurth*, 380 N.W.2d at 695 (citation omitted).

> Some of the indicia of a fiduciary relationship include the acting of one person for another; the having and the exercising of influence over one person by another; the reposing of confidence by one person in another; the dominance of one person by another; the inequality of the parties; and the dependence of one person upon another.

*Id.* at 696 (citation omitted).

Similarly, the jury was instructed:

> [A] fiduciary relationship is a relationship of trust and confidence on a subject between two persons. One of the persons is under a duty to act for or give advice to the other on that subject. Confidence is placed on one side and domination and influence result on the other.
>
> Circumstances that may indicate the existence of a fiduciary relationship include the acting of one person for another, the having and exercising of influence over one person by another, the placing of confidence by one person in another, the dominance of one person by another, the inequality of the parties, and the dependence of one person upon another. None of these circumstances is more important than another. It is for you to determine from the evidence whether a fiduciary relationship existed between the parties.

The defendants argue they were not in fiduciary relationships with C2P or the partnership because "Agri Control and Fedie were not acting for C2P and [the partnership]; instead, they were acting together with [them]. None of the parties had any particular influence over the other nor any dominance. There was clearly no inequality of parties whereby one was dependent upon the other."

But the facts do not align with the defendants' argument. Agri Control—and by extension, Fedie—was responsible for the management of the venture; it was the one with access to all of the information the partnership needed to make decisions, making the partnership dependent on it. Even if the members of C2P and the partnership were savvy about pig ventures and not reliant on the defendants' expertise, the plaintiffs still depended on Agri Control and Fedie to both obtain and accurately report information—as it was contractually obligated to do by the management services agreement. For example, Dan Cudmore was hired to oversee the partnership's pigs; he compiled data on how each group was doing and gave those reports to Fedie and Agri Control. With this information, the profitability of each group could be determined, as well as highlighting what specific issues were costing the most money—feed, veterinary bills, high mortality rate,

etc.  Similarly, all of the partnership's bills went to Agri Control, so they could be paid and recorded.  C2P and the partnership depended on Agri Control to not only pay the bills, but also accurately and reliably report the partnership's information so it could make decisions going forward.

The parties' access to information was unequal.  Cudmore's testimony about attending a meeting with the C2P investors highlighted that.  At that meeting, Fedie gave a financial report "that really made one think that this—this [partnership] was going pretty well."  But Cudmore had completed the closeout reports and spoke to bookkeepers in Fedie's office; his access to internal information made him aware the partnership did not actually have "that money. [He] didn't see that kind of profitability."  From its superior vantage point, Agri Control—acting through Fedie—had influence over C2P and the partnership.

There is substantial evidence of a fiduciary relationship between the defendants and plaintiffs.

**C. Piercing Corporate Veil.**

The defendants argue the district court should have granted their motion for directed verdict or JNOV as to the partnership's request to pierce the corporate veil of Agri Control to get to Fedie for its breach-of-contract claim.  In other words, they argue only Agri Control should be liable for the $400,000 judgment against it for breach of contract against the partnership.

Piercing the corporate veil requires exceptional circumstances.  *See Briggs Transp. Co. v. Starr Sale Co.*, 262 N.W.2d 805, 810 (Iowa 1978).  That said, "the corporate entity should be disregarded where doing so would prevent the parent from perpetuating a fraud or injustice, evading just responsibility or defeating public

convenience." *Id.* Factors to be considered in determining whether the veil should be pierced include whether

> (1) the corporation is undercapitalized, (2) the corporation lacks separate books, (3) its finances are not kept separate from individual finances, or individual obligations are paid by the corporation, (4) the corporation is used to promote fraud or illegality, (5) corporate formalities are not followed, or (6) the corporation is a mere sham.

*Id.*

> The defendants moved for directed verdict, arguing:

> There has been no evidence and are not sufficient evidence in the record to establish that the corporation was undercapitalized, that the finances were not kept—that were—the finances—that finances were not kept separate from individual finances, that the corporation was used primarily to provoke fraud or illegality, or that corporate formalities are not—were not followed.
>       I think the evidence shows to the contrary, that Agri Control and Mr. Fedie, he signed contracts and agreements, and they were signed by the—as a corporation by Mr. Fedie, as the president of the corporation, and that a valid corporation existed and that he had at all times operated in making contracts as a corporation and that the formalities of a corporation were, in fact, being followed.
>       There's no evidence that he was commingling any of his individual finances with the corporation or that individual obligations were being paid by the corporation.

In its written resistance filed after trial,[13] the partnership argued substantial evidence supported the jury's finding that the corporate veil should be pierced under either a theory that Fedie used the corporation to pay for his individual obligations—such as buying and refurbishing a boat—or that Fedie continued to operate Agri Control to promote the fraud he was perpetrating on the partnership.

---

[13] The district court reserved ruling on the motion for directed verdict until after the jury reached a verdict. *See Larkin v. Bierman*, 213 N.W.2d 487, 490 (Iowa 1973) (stating the better practice is to reserve ruling on the directed verdict motion until after the jury has rendered verdict, so as to avoid retrial).

In the district court's written denial of the defendants' post-trial motions, the court focused on the "personal expenses of Fedie being paid by corporate monies" and that a reasonable juror "could conclude Fedie was promoting fraud by his use of these monies when the business venture was in dire financial straits."

"[A] corporate officer is individually liable for fraudulent corporate acts which he or she participated in or committed." *Id.* at 809. Here, as part of the special verdict, the jury concluded that Fedie made fraudulent misrepresentations to the partnership. Because the jury instruction on fraudulent misrepresentation limited the jury's consideration to financial reports Fedie gave on behalf of Agri Control and the thirteen-page document Fedie handed out to possible C2P investors regarding a marketing opportunity to Agri Control, the jury had to have concluded Fedie—while acting on behalf of Agri Control—made fraudulent misrepresentations. This is sufficient to pierce the corporate veil and hold Fedie personally liable.

Additionally, commingling of funds occurs when the same account is used to deposit fees and pay for expenses for both personal and business use. *See Iowa Sup. Ct. Bd. of Prof'l Ethics & Conduct v. Sunleaf*, 588 N.W.2d 126, 126 (Iowa 1999) (discussing attorney trust account commingling). Activities such as using corporate funds for personal purposes, mixing corporate and personal accounts, and commingling assets are factors weighed under this element. *See* 1 Williams Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 41.50 (Sept. 2021 update). Fedie testified the purchase of the salvaged boat for $94,900 as well as the docking fees in Florida, repair and maintenance, and boat insurance were business expenses that were properly paid for by the corporation. But the

corporation is an agriculture-based business that operates out of the Midwest. The plaintiffs generated at least a jury question as to whether Fedie was using Agri Control's funds to purchase personal items. *See Woodruff Constr., L.L.C. v. Clark*, No. 17-1422, 2018 WL 3913776, at *6 (Iowa Ct. App. Aug. 15, 2018) ("Separate finances are not merely the existence of an account with the corporation's name on it.").

### D. Admission of Exhibit on Rebuttal.

The defendants challenge the admission of plaintiffs' exhibit 86, C2P's bank statement for January 2015, which was admitted during Dean's rebuttal testimony. On appeal, the defendants contend the exhibit "had not been previously disclosed to [them] or listed on the Plaintiffs' exhibit list." Additionally, they claim, "This exhibit could have easily been designated and offered by the Plaintiffs during their case in chief as proof of that contention. Instead, the Plaintiffs concealed this exhibit from the Defendants and did not offer it until their rebuttal."

At trial, the defendants claimed exhibit 86 should not be admitted because it was "not previously provided." The plaintiffs responded, stating, "We obtained and produced electronically all of the bank records that pertained to C2P Pigs. That's what this is." The court then turned back to the defendants asking, "[H]aving heard that, in fact, it's a part of the bank records previously disclosed, do you take any exception to that?" The defendants acquiesced, responding, "I can't, Your Honor, without—I mean, there are lots of records to have to go back and look at to determine whether it was." The district court never ruled on whether the document was previously disclosed because the defendants gave up their claim it was not.

The defendants cannot now renew that claim and, even if they could, we would have no way of evaluating it. We do not consider that part of their argument further.

We are unclear as to the rest of the defendants' argument. They appear to be arguing that exhibit 86 should have been excluded because the plaintiffs failed to include it on their exhibit list at least seven days before trial, as was required by the trial scheduling and discovery plan; it was improper rebuttal evidence because it should have been offered during the plaintiffs' case-in-chief; or both. But the defendants do not elucidate either of these arguments; they offer no framework to review the admission of the evidence in light of the respective arguments nor any authority to support exclusion of the evidence as the proper remedy. We decline to take on their advocacy for them. *See State v. Coleman*, 890 N.W.2d 284, 304 (Iowa 2017) (Waterman, J., dissenting) ("Judges cannot assume the role of a partisan advocate and do counsel's work.").

### E. Jury Instructions.

The defendants challenge some of the instructions given to the jury. To preserve error on a jury instruction, the defendants were required to raise the specific objection to the instruction "at a time when the district court can take corrective action." *Schmitt v. Koehring Cranes*, *Inc.*, 798 N.W.2d 491, 496 (Iowa Ct. App. 2011). Raising the issue to the court before the instructions went to the jury was sufficient; the defendants were not required to re-raise the issue in their motion for new trial. *See id.* (concluding jury-instruction issues were preserved even though objecting party did not raise the issue in its motion for JNOV or new trial).

We review challenges to jury instructions for correction of errors at law. *State v. Walker*, 600 N.W.2d 606, 608 (Iowa 1999). "We review the trial court's instructions 'to determine whether they correctly state the law and are supported by substantial evidence.'" *Id.* (citation omitted). "Instructional errors do not merit reversal unless prejudice results." *Rivera v. Woodward Res. Ctr.*, 865 N.W.2d 887, 892 (Iowa 2015). "Prejudice occurs and reversal is required if jury instructions have misled the jury, or if the district court materially misstates the law." *Id.*

**Instruction No. 32.** First, the defendants challenge instruction 32, which states:

> Plaintiff Breach of Fiduciary Duty
> The plaintiffs, C2P Pigs and C2P Pigs/Kingsley, have asserted a claim for breach of fiduciary duty against the defendants, Mr. Fedie and Agri Control. For C2P Pigs and C2P Pigs/Kingsley to be awarded damages against Mr. Fedie and Agri Control for their breach of fiduciary duty claim, C2P Pigs and C2P Pigs/Kingsley must prove all of the following propositions:
> 1. A fiduciary relationship existed between the plaintiffs and the defendants.
> 2. During the existence of the fiduciary relationship, the defendants breached a fiduciary duty.
> 3. The breach of the fiduciary duty was a cause of damage to the plaintiffs.
> 4. The amount of damage.
> If C2P Pigs and C2P Pigs/Kingsley have failed to prove any of these propositions, C2P Pigs and C2P Pigs/Kingsley cannot recover damages. If C2P Pigs and C2P Pigs/Kingsley has proved all of these propositions, C2P Pigs and C2P Pigs/Kingsley is entitled to recover damages in some amount.

Here on appeal, the defendants argue the use of "plaintiff" in the title "is confusing," that the instruction implies there was a fiduciary duty between the plaintiffs and defendants, and the jury should have been required to make a "threshold determination that a fiduciary relationship existed before there could be a consideration of a breach of that duty."

At trial, the defendants challenged instruction 32, stating:

[A]s I mentioned yesterday, the fiduciary is—there should be an instruction or, excuse me, a determination in the verdict instruction as to making a determination whether or not Agri Control or Mr. Fedie was, in fact, a fiduciary. I think there is instruction—yes, okay. Anyway, just so they have to make a determination of the fiduciary before they can determine whether there was a breach of fiduciary duty.

The defendants failed to preserve a challenge as to the title of the instruction or any wording in the instruction that implies a fiduciary duty. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). The district court denied their objection as to a separate instruction requiring a "threshold determination" about whether a fiduciary relationship existed, so we review that ruling.

We note that instruction 32 as worded requires the jury to first determine, under paragraph 1, whether "a fiduciary relationship existed between the plaintiffs and the defendants." While "the district court is required to instruct the jury as to the law applicable to all material issues in the case," "the court is not required to give any particular form of an instruction." *State v. Becker*, 818 N.W.2d 135, 141 (Iowa 2012), *overruled on other grounds by Alcala v. Marriot Intern., Inc.*, 880 N.W.2d 699, 708 n.3 (Iowa 2016). "A trial court is . . . not required to instruct in the language of requested instructions so long as at the topic is covered." *State v. Bolinger*, 460 N.W.2d 877, 880 (Iowa Ct. App. 1990). The instruction required the jury to make the determination about the fiduciary status as part of the elements the plaintiffs had to prove, thus there was no rationale for imposing a separate step. And, in deciding what language to use "to convey a particular idea to the

jury," the trial court's discretion is "rather broad." *Stringer v. State*, 522 N.W.2d 797, 800 (Iowa 1994). The district court acted within its broad discretion in declining to give an additional instruction on fiduciary relationships.

**Instruction No. 21.** The defendants also challenge instruction 21, which states:

> C2P Pigs/Kingsley alleges that Agri Control breached the Management Services Agreement in one or more of the following ways:
>
> 1. Paying itself management fees which were not due under the terms of the agreement;
>
> 2. Failing to maintain accurate and complete financial records kept in accordance with generally accepted accounting principles showing all partnership assets, liabilities, income, and expenditures;
>
> 3. Providing materially inaccurate and misleading financial reports to C2P and its members;
>
> 4. Failing to establish and maintain one or more bank accounts devoted to partnership funds;
>
> 5. Failing to follow the terms of the partnership agreement when managing finances of the C2P Pigs/Kingsley partnership;
>
> 6. Failing to perform services in a good and workmanlike manner;
>
> 7. Failing to fully disclose any and all circumstances that could and did cause a conflict of interest between the respective interests of the Kingsley partnership and Agri Control;
>
> 8. Failing to timely and completely communicate with the partnership regarding its performance of services;
>
> 9. Failing to provide complete and accurate written reports on a quarterly basis showing operational and financial matters;
>
> 10. Failing to prepare balance sheets and income/expense statements after every sale of livestock within thirty (30) days after the close of the relevant period;
>
> 11. Accepting work and obligations inconsistent or incompatible with Agri Control's obligations to be rendered for the partnership pursuant to the Management Services Agreement.

On appeal, the defendants challenge paragraphs two and four. They argue there was "no evidentiary support" that Agri Control failed to maintain financial records in accordance with generally accepted accounting principles or failed to establish and maintain one or more bank account. But these are not the

challenges they raised to the jury instruction at the district court. At trial, they argued:

> Regarding Instruction Number 21, I think that in that instruction that there's too much duplication, which is going to confuse the jury and to allow them too many options; for example, two says, Failing to perform and maintain adequate and complete financial records kept in accordance with accepted accounting principles showing all the partnership assets, liabilities, et cetera.
>
> Number 3 says, "providing material,—"materially inaccurate and misleading financial records." That's the same—that's the same thing, failing to maintain adequate—adequate records, and then producing inaccurate records is essentially saying the same thing.
>
> Number 4, failing to maintain a partnership bank account devoted exclusively to partnership funds, that that's not a requirement. The requirement was of the contract to keep separate records for the partnership, which was done, not that it was required that they have a separate bank account exclusively for the partnership funds.
>
> Five is failing to follow the terms of the partnership agreement when managing finances, that that's the same as failing to maintain adequate records, providing inaccurate and misleading information, and the same as four. I mean, four fits in there also.
>
> Six, failing to perform services in a good and workmanlike manner. I don't think that there was ever established in this evidence what is a good and workmanlike manner for performing the type of services that were contracted for and, therefore, it's left to the jury to decide for themselves what they think was good and workmanlike, without anything standard for them to go by.
>
> Seven, failing to disclose any and all circumstances that could and did cause a conflict of interest. I don't know where that is in the contract that says that they're obligated not to—or required to disclose any such circumstances.
>
> Eight, failing to timely and completely communicate with the partnership regarding the performance of the services. I'm going to skip by that.
>
> Number 9, I think, is duplicative, failing to provide complete and accurate writing agreements quarterly. That's the same as maintaining records and in providing inaccurate and misleading information.
>
> Ten, failing to prepare balance sheets. Once again, that's the same as maintaining accurate and complete records.
>
> And 11, I don't know where in the contract that they're required to do that.
>
> And that's all.

We do not consider whether substantial evidence supports instructing the jury on paragraphs two and four because the issue was not preserved.

The defendants did raise the theme of "too much duplication" to the trial court, which they raise again on appeal. But they have cited no authority to support a finding that "duplication" is an error in a jury instruction, let alone a reversible error.

**Instruction No. 41.** Finally, the defendants state in passing, "Although Instruction No. 41 informs the Jury that a party cannot recover duplicate damages, that appears to be exactly what happened in this case." This is not a challenge to the jury instruction itself; we do not review instruction 41.

### F. Damages.

The defendants argue the court should have granted their motion for new trial under Iowa Rule of Civil Procedure 1.1004(6) because the jury's award of damages is unsupported by the evidence. They also claim the damages awarded are "[e]xcessive . . . and appear[] to have been influenced by passion or prejudice." *See* Iowa R. Civ. P. 1.1004(4).

On appeal, the defendants argue the evidence does not support the amount of damages awarded—not the total amount awarded, the apportionment between C2P and the partnership, nor the specific amounts for each party as to each claim. But these issues have not been preserved for our review. The defendants raised some issues regarding the damages in their motion for new trial, but the district court failed to consider or rule on the damages and the defendants failed to file a rule 1.904 motion seeking a ruling. *See State v. Walker*, 304 N.W.2d 193, 195 (Iowa 1981) ("Our rule is that, when a motion is not ruled on in the trial court, and

there is no request or demand for ruling, error has not been preserved."); *see also Meier*, 641 N.W.2d at 537 ("When a district court fails to rule on an issue properly raised by a party, the party who raised the issue must file a motion requesting a ruling in order to preserve error for appeal.").

**III. Conclusion.**

The defendants have not shown the district court committed a reversible error; we affirm the judgment against them.

**AFFIRMED.**